## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ALABAMA
## MOBILE DIVISION

SHERRY DIGMON; VERONICA ASHLEY FORE;
CYNTHIA JACKSON; and DON FLETCHER,

     *Plaintiffs,*

v.

STEPHEN BILLY, District Attorney, in his
individual capacity;

HEATH JACKSON, Sheriff, in his official
and individual capacities;

ARTHUR ODOM, Sheriff's Deputy, in his
individual capacity;

KEVIN DURDEN, Sheriff's Deputy, in his
individual capacity;

MATTHEW RABREN, Sheriff's Deputy, in
his individual capacity; and

STEVEN DERECK LOWRY, Sheriff's Deputy,
in his individual capacity,

     *Defendants.*

Civil Case No. 1:24-cv-00425-TFM-B

**AMENDED COMPLAINT
AND JURY DEMAND**

## INTRODUCTION

1.      A local political dispute over whether to retain a school superintendent ended with two school-board members, the school's payroll supervisor, and a local journalist in jail.  None of them committed any crimes.  But that didn't stop Escambia County's top law-enforcement officials from abusing their offices to punish anyone they thought stood in the way of extending the superintendent's contract.

2.      District Attorney Stephen Billy and Escambia County Sheriff Heath Jackson both took an unusual personal interest in School Superintendent Michele McClung's tenure.  The two men decided that they were the law in Escambia County, and opposing McClung was against the law.  They openly threatened to retaliate against anyone who stood between them and four more years of McClung.  And once the School Board—which includes Plaintiffs Sherry Digmon and Cindy Jackson—decided not to renew McClung's contract, DA Billy and Sheriff Jackson made good on their retaliatory threats.

3.      With the help of several local officials, DA Billy and Sheriff Jackson planned and carried out a convoluted conspiracy of retaliation.  The conspirators seized Cindy's and Sherry's cell phones for the crime of talking to each other about McClung.  And they seized the phone of Plaintiff Ashley Fore (the school district's payroll supervisor) without even bothering to get a warrant.  Then, when Sherry's newspaper, *Atmore News*, published a story by Plaintiff Don Fletcher about DA Billy's interest in the School Board, the sheriff and district attorney kicked off a wave of arrests.  Within days, they locked up Sherry, Don, and Ashley for revealing grand-jury secrets—even though there was no grand jury, Plaintiffs were not bound by any secrecy laws, and they were not privy to any secrets.  In

other words, it was all a sham.  Over the next few weeks, they arrested Cindy, arrested Sherry again, and impeached Sherry to try to remove her from the Board.

4.      It took almost four months and the School Board paying out the remainder of McClung's contract before DA Billy finally admitted to the court that he had both personal and professional conflicts of interest in his cases against Plaintiffs—demonstrating that he had no business leading the investigation into them to begin with. The Alabama Attorney General's Office took over the prosecutions and promptly dropped all the charges.  But for Plaintiffs, the damage was already done.

5.      Americans must be able to participate in local government without fear that they'll be branded political enemies, investigated, and punished for speaking their mind. Criticism isn't criminal.  Our Constitution ensures that government officials can't use their authority to punish people who disagree with them about who should hold local office.

6.      This lawsuit seeks to remedy the harm that Sherry, Ashley, Cindy, and Don suffered because DA Billy, Sheriff Jackson, and their allies conspired to violate Plaintiffs' civil rights.  Defendants arrested Plaintiffs and seized their phones without any legitimate basis to do so in retaliation for Sherry's, Cindy's, and Don's protected speech.  Their conduct violated the First and Fourth Amendments.

## JURISDICTION & VENUE

7.      Plaintiffs bring this civil-rights lawsuit pursuant to 42 U.S.C. § 1983 and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, for violations of rights, privileges, or immunities secured by the United States Constitution.

8.      This Court has jurisdiction under 28 U.S.C. §§ 1331 & 1333.

9.      Venue is proper in the Southern District of Alabama under 28 U.S.C. § 1391.

**PARTIES**

10.      Plaintiff Sherry Digmon was born in Atmore and has been reporting the news there for 35 years.  Sherry began working as a journalist in 1990 and eventually started *Atmore Magazine* in 2002 and *Atmore News*, a weekly newspaper, in 2005.  Sherry also serves her community as a member of the Escambia County School Board.  She initially served a six-year term from 2010 to 2016.  Then, following a five-year hiatus, Sherry was appointed to fill a vacancy on the Board in 2021 and won a six-year term in 2022.  Sherry was 72 years old at the time of her arrest.

11.      Plaintiff Veronica "Ashley" Fore is a lifelong resident of Escambia County.  She and her husband, Ryan, live in Brewton near their children and grandchildren.  Ashley began working for the Escambia County School Board as a substitute teacher in 2004 and has steadily worked her way up through different roles in the district.  In the summer of 2023, just before the events in this lawsuit, Ashley was promoted to Payroll Supervisor, a position that made her the custodian of certain records for the Board.  Ashley was 47 years old at the time of her arrest.

12.      Plaintiff Cynthia "Cindy" Jackson has lived in Escambia County with her husband, Charles, since 1973.  Cindy has always been an active member of the community and has worked for the school district for 28 years.  In 2010, she won a seat on the School Board and has been serving ever since.  Cindy was 72 years old at the time of her arrest.

13.      Plaintiff Don Fletcher is a journalist for *Atmore News*.  After beginning his career in Georgia, Don moved to Escambia County in 2016 and joined the staff at *Atmore*

*News* as a reporter. It was his work as a journalist that led Defendants to arrest Don for publishing non-privileged information on an issue of public importance. Don was 69 years old at the time of his arrest.

14.    Defendant Stephen Billy is the District Attorney for Alabama's 21st Judicial District, which is coextensive with Escambia County. As the district attorney for Escambia County, Billy has many investigative powers, including to advise grand juries on matters of law, examine and swear grand-jury witnesses, draw up indictments, prosecute indictable offenses, and to issue subpoenas when the grand jury is not in session. He can also institute impeachment proceedings against county officers, including members of the county school board, based on the report of a grand jury that he has the sole authority to convene. Billy used those powers to investigate Plaintiffs, have them arrested, and even institute impeachment proceedings against Sherry. Plaintiffs sue Billy in his individual capacity.

15.    Defendant Heath Jackson is the Sheriff of Escambia County. In that office, Sheriff Jackson must, "with the assistance of deputies as necessary, ferret out crime, apprehend and arrest criminals and, insofar as within their power, secure evidence of crimes in [Escambia County] and present a report of the evidence so secured to the district attorney or assistant district attorney for the county." Sheriff Jackson used those powers to investigate Plaintiffs and order the seizure of their phones and persons without any legitimate basis. Plaintiffs sue Sheriff Jackson in both his official and individual capacities.

16.    Defendant Arthur Odom is a Sheriff's Deputy in Escambia County. Deputy Odom used his authority to procure invalid warrants for Plaintiffs' cell phones and to arrest

Plaintiffs without probable cause. Plaintiffs sue Deputy Odom in his individual capacity.

17. Defendant Kevin Durden is a Sheriff's Deputy in Escambia County. Deputy Durden used his authority to seize Plaintiffs' cell phones and to arrest Plaintiffs without probable cause. Plaintiffs sue Deputy Durden in his individual capacity.

18. Defendant Matthew Rabren is a Sheriff's Deputy in Escambia County. Deputy Rabren used his authority to seize Plaintiffs' cell phones and to arrest Plaintiffs without probable cause. Plaintiffs sue Deputy Rabren in his individual capacity.

19. Defendant Steven "Dereck" Lowry was a Sheriff's Deputy in Escambia County. Deputy Lowry used his authority to seize Cindy's cell phone. Plaintiffs sue Deputy Lowry in his individual capacity.

## BACKGROUND

20. This case revolves around Michele McClung's tenure as the Superintendent of Escambia County Schools and the unconstitutional scheme that her allies in law-enforcement orchestrated to dole out punishment on two School Board members who opposed her, plus a local journalist and a School Board employee who got caught up in Defendants' unconstitutional scheme.

21. The Escambia County School Board hired McClung as superintendent on a contract that ran for two years and 10 months, beginning with the 2021 school year through May 31, 2024.

22. Before taking the job as superintendent, McClung worked in the Mobile school district. She brought several staff members from Mobile with her to Escambia County.

23.    McClung's desire to hire her people from Mobile led her to ostracize longtime employees from Escambia County.

24.    To counterbalance the tension she created, McClung ingratiated herself with certain local officials.  Among others, McClung quickly developed a close relationship with Board member Mike Edwards, Board President Danny Benjamin, Board member Coleman Wallace, District Attorney Stephen Billy, and Sheriff Heath Jackson.

### The State Audits McClung's School Board

25.    During the summer of 2023, the Alabama Department of Examiners of Public Accounts conducted its annual audit of the Escambia County School Board.

26.    On July 18, 2023, the audit manager emailed the Board and requested a meeting to address significant negative findings.  The Statement of Auditing Standards requires auditors to present findings or issues they find that they deem to be significant and relevant.

27.    The negative preliminary results reflected poorly on McClung and her administration.  But the audit results were not, as McClung would later claim, grounds for her arrest.

28.    Two state auditors held a meeting with McClung and the Board on July 31, 2023, to go over the audit's preliminary negative results.

29.    McClung brought two private attorneys to represent her at the meeting.

30.    After the meeting, McClung tried to track down the auditors' personal cell-phone numbers.

31.    McClung also met with DA Billy and Sheriff Jackson about the audit.

6

32.    Throughout this period, McClung spent a lot of time at DA Billy's office across the street from the Board office.

33.    A couple weeks later, McClung texted the members of the Board to "update everyone on the latest with the examiners." McClung told the Board that the auditors who "spoke to the board two weeks ago removed themselves from the audit."

34.    On information and belief, the auditors withdrew due to political pressure applied by McClung's allies.

35.    According to McClung, however, the state agency handling the audit told her that "they have seen absolutely nothing that bothers them or is out of the ordinary."

36.    The final audit report from the Examiners of Public Accounts identified two negative findings for the 2021-22 school year: (1) the School Board had not properly recorded and reconciled its transactions, which resulted in discrepancies between the Board's general ledger and the cash in the Board's bank accounts; and (2) the Board had not published its complete financial statements in a county-wide newspaper. (Aside from helping explain the behavior that followed from McClung and her allies, the audit results have no further bearing on this lawsuit.)

**Surprise Vote at the August 30 Board Meeting**

37.    At the School Board meeting following the July 31, 2023, meeting with the auditors, McClung's three allies on the Board surprised the rest of the Board with an unscheduled vote to suddenly extend McClung's contract.

38.    McClung's contract was not set to expire for another nine months, after the coming school year.

39.    Ordinarily, the Board would not have considered an extension to McClung's contract until around March 2024, the spring before her contract was set to expire.

40.    It was not just the timing that was unusual, however; the introduction of the motion to extend McClung's contract also deviated from standard practice.

41.    In the normal course of business, before a Board meeting, the Board's attorney would circulate a written copy of any motions that a member planned to present. The attorney would share a copy with each Board member so that they knew what they'd be voting on at the meeting.

42.    The August 30 Board meeting did not follow this standard process.

43.    Just before the meeting, McClung's three allies on the Board—Board President Danny Benjamin, Mike Edwards, and Coleman Wallace—all met with McClung and the Board attorney in McClung's office and walked into the Board meeting together.

44.    President Benjamin began the meeting by reminding the Board members of the Board's mission to serve the children's interests.

45.    After some brief preliminary items, Benjamin called an item entitled, "Discuss Superintendent's evaluations and next steps."



46.    The Board attorney then gave the results of the Board members' evaluations of McClung's job as superintendent.  The results, which were a simple average of each

member's evaluations of McClung, showed that McClung received an average of "satisfactory" for each criterion.

47.    An average score of "satisfactory" reflected that the Board was largely split on McClung's performance.  While McClung's three allies on the Board thought she was exceeding expectations, the remainder of the Board was less convinced that McClung was a good fit for the district.

48.    Sherry and Cindy heard repeatedly from teachers and administrators throughout the district that working for McClung was unbearable.  Often through tears, school employees described their issues with McClung on the condition of anonymity due to the culture of fear that McClung fostered.  Many left the district altogether due to McClung's leadership.

49.    After the Board attorney finished relaying McClung's "satisfactory" evaluation, Board President Benjamin alluded to what he meant by the "next steps" portion of the action item: He said it would be "a wise decision on the part of this Board to move to the next steps" given McClung's satisfactory performance.

50.    Benjamin then looked over to Board member Coleman Wallace who pulled out a prepared motion: "Chairman, I make a motion to renew the employment contract of Superintendent Michele McClung for a period starting today and ending June 30, 2027. And to authorize Board President Danny Benjamin and our attorneys to negotiate any changes to the terms of the contract."

51.    In other words, Wallace was asking the Board to suddenly vote—without warning, preparation, or discussion—to give McClung a four-year extension on her initial

34-month contract, for an unspecified salary that two of McClung's allies (Board President Benjamin and the Board attorney) would have full discretion to set.

52.     While several Board members looked around in surprise at Wallace's motion, Benjamin and Wallace both turned immediately to Board member Mike Edwards as Benjamin asked for a second.

53.     Edwards quickly seconded the motion, and Benjamin quickly called a vote, at which point Wallace, Edwards, and Benjamin all raised their hands in favor.

54.     Board Member Kevin Hoomes was the first to vote no, followed by Cindy.

55.     The two no votes prompted a roll-call vote.

56.     The roll-call vote to extend McClung's contract failed 4-3, with Hoomes and Board member Loumeek White voting no, along with Cindy and Sherry.

57.     After an extended silence, Benjamin said, "We will not *today* renew the superintendent's contract based on the vote."

58.     "As President of this Board," he continued, "I think it would be wise for this Board to table it and vote on it on the 14th of September because we don't need to wait any much longer than we have already sitting at this meeting today because we see what's in front of us and we see what the value of having a superintendent.  And it's not fair to this Board nor Ms. McClung to hold her in limbo because all of us are adults knowledgeable about the educational process in Escambia County.  We know what's at stake here, okay?  So I think we need to make sure we do what's right and come back on the 14th to move to the 'next steps.'  It's not fair to our superintendent.  Do we really know how many counties would love to have what we have?  I don't think we understand that.  But it's so

important that we do the right thing for the children of Escambia County. Do you see all the data that we put forward in her evaluation review? We know what she's capable of doing. The proof is in the pudding. Why in the world do we need more time? I'm going to say, as President of this Board, that we come back to September on the 14th, at that meeting—it's on the agenda today as 'next steps'—so maybe by then the Board will have a consensus or we can go into executive session. And if you don't, what a disservice you're doing—we're doing—to Escambia County."

59.    Following Benjamin's speech, Cindy said, "Mr. President, we just voted, and I don't think people are going to change their minds."

60.    Board member Hoomes interjected that he was confused why the Board was even voting to renew McClung's contract 10 months before it was set to expire. He noted that the Board would typically not vote on an expiring contract until March.

61.    Benjamin responded that it was not fair to McClung to wait until March and that it was not fair to the students of Escambia County for the Board to "wait, wait, wait."

62.    Benjamin then said, "We're not trying to pressure anyone into doing anything," to which Hoomes replied, "That's what it feels like," as Board member White nodded in agreement.

63.    White also questioned why the Board was voting on McClung's contract when she still had 10 months left.

64.    That prompted Mike Edwards to lean forward and point at Cindy, saying, "You know why we're voting on it? Because it's personal agendas here. Everyone who voted no has a personal agenda."

**McClung's Allies Delay a Second Vote to Campaign for McClung**

65.    The second vote on McClung's contract extension was postponed several times.

66.    In the meantime, McClung's allies—led by DA Billy and Sheriff Jackson—began plotting to shut down any opposition to retaining McClung.

67.    On September 16, 2023, Sheriff Jackson called Cindy's husband, Charles, and asked, "What the hell's going on with this school?"

68.    Sheriff Jackson said that "word on the street" was that Cindy was telling people that there were findings in the state audit that would lead to McClung's arrest.

69.    Charles didn't know what Sheriff Jackson was talking about.  Neither he nor Cindy had told anyone in the community that McClung could be arrested over the state audit—the proposition that McClung would be arrested was entirely absurd.

70.    On information and belief, McClung was using the rumors to curry sympathy and provoke the support of her political allies.

71.    Two days after his call to Cindy's husband, Charles, on September 18, 2023, Sheriff Jackson and DA Billy both attended a local GOP meeting where they made public their plans to retaliate against anyone who opposed McClung.

72.    Sheriff Jackson told the meeting that he investigated the rumors about the audit and confirmed for himself that McClung had done nothing wrong.

73.    County sheriffs in Alabama do not typically investigate the preliminary results of a state audit into the School Board.

74.    Emphasizing that the rumors about McClung were baseless, Sheriff Jackson

12

vowed to punish anyone who stood in McClung's way.

75.    Sheriff Jackson told the meeting that he would arrest McClung's detractors on a Friday so that they couldn't bail out until Monday and would have to "eat his hotdogs all weekend."

76.    After the meeting, Sheriff Jackson confided in a community member that, if the vote for the superintendent did not "go the way it should," then "the *wrath* would be coming down on some school board members."

77.    When Cindy learned of Sheriff Jackson's menacing tirade, she called him and said he was only hearing one side of the story.

78.    Cindy told Sheriff Jackson that people throughout the district had expressed their concerns with McClung's leadership, to which Sheriff Jackson responded, "Have you ever thought that they just aren't doing their job and now McClung is making them?"

79.    Sheriff Jackson told Cindy she should team up with McClung.  He said two women would make a good team and that McClung wanted Cindy's support and wanted her to be Board president.

80.    Meanwhile, Charles Jackson reached out to DA Billy to ask about what he and Sheriff Jackson were talking about at the GOP meeting.

81.    DA Billy told Charles, "There is nothing else to say.  Y'all were out telling that Michele was audited and was going to be arrested.  I just wanted to clear the air and set the record straight.  The whole thing disappoints me."

82.    He then followed up with a second message, which said, "Y'all have spread vicious lies about Michele from day one from her personal life to her professional life.  My

information comes from some very credible people some of who are public officials.  I'm certainly not going to argue with you about it.  This whole thing is wrong and based on a personal dislike for her and not her job performance.  It is downright childish and a disservice to our school system.  We will see what happens but whatever that is, I'm going to do my job."

83.    Other local officials then began to reach out to Cindy and Sherry about McClung's contract.

84.    The mayor of Atmore, Sherry's hometown, came to her office at *Atmore News* twice to talk to Sherry about her vote against McClung.

85.    And the Fire Chief of Flomaton asked Cindy to change her vote.

**DA Billy Subpoenas the Board for Records Relating to the Prior Administration**

86.    While McClung spread rumors and Sheriff Jackson vowed to arrest her opponents, DA Billy began to use the power of his office to investigate the political dispute.

87.    On September 19, 2023, the day after the local GOP meeting, DA Billy issued a subpoena to the Escambia County School Board pursuant to his powers as district attorney.

88.    This subpoena was a trap.  DA Billy issued it as part of a sham investigation to help create the pretext to arrest Plaintiffs.

89.    Although Billy would later claim that his subpoena was a secret grand-jury document, it very clearly came from him—not a grand jury.

90.    The heading at the top of the subpoena described the document as a

"DISTRICT ATTORNEY'S SUBPOENA."



91.    The subpoena, signed only by DA Billy (and *not* a grand juror), was issued to "Rochelle Richardson and/or Ashley Fore," as the Board's records custodians.

92.    The subpoena does not bear any of the features of the many documents issued and signed by an actual grand jury in Escambia County.

93.    Nor does the subpoena even mention a grand jury—because it was not issued by a grand jury.

94.    Nor did the subpoena mention that its existence was confidential—because it was not confidential.

95.    Instead, the subpoena said that it was "issued under the provisions of § 12-17-184, Code of Alabama."

96.    The only power related to subpoenas set out in § 12-17-184 is in subsection (16), which authorizes the District Attorney to issue subpoenas "at any time the grand jury is not in session."  The statute makes no other mention of subpoenas, and none of its references to grand juries relate to the subpoena power.

97.    DA Billy's explicit reliance on § 12-17-184 shows both that he issued the

15

subpoena himself and that there was no grand jury in session at the time.



This subpoena is issued under the provisions of §12-17-184, Code of Alabama, 1975, as amended

Witness my hand, this the _8th_ day of _September_, 2023

Stephen M. Billy
District Attorney
21st Judicial Circuit of Alabama
(251)867-0239

98.    Sheriff Jackson served DA Billy's subpoena on Ashley at her office at the Board.

99.    Even though Sheriff Jackson knows Ashley personally, he asked her if she was Ashley Fore as he handed her the subpoena. This strange formality made Ashley sense that something was off.

100.    The subpoena gave the Board 10 days to provide the District Attorney with "certified copies of any and all checks written to employees and labeled as 'COVID' payments or 'COVID BONUS' for the years 2020-23."

101.    The bonuses that the subpoena referenced were supplemental payments made with COVID-relief funds that the Board authorized under the prior administration. The payments went to seven Board employees from the prior administration who McClung had not yet pushed out.

102.    On information and belief, the purpose of the subpoena was to create the impression that the prior administration—and not McClung—was responsible for any indiscretions and investigations surrounding the district's finances.

103.    The subpoena noted that the COVID-payment records were related to "an investigation/prosecution into a criminal matter" and instructed the custodian to contact

DA Billy's office for specific instructions.

**McClung Pays an Unannounced Nighttime Visit to Ashley's Office**

104.    Later that evening, after Sheriff Jackson served Ashley with DA Billy's subpoena, Ashley met in her office with her predecessor to go over some contract-processing issues.

105.    While the two women worked late in Ashley's office, Ashley kept her office door locked to be safe, as they were the only ones still there that evening.

106.    The two women heard someone jiggle the handle to the locked door, trying to get into Ashley's office after hours.

107.    When Ashley looked out into the hallway, she saw Shaun Goolsby, a member of McClung's staff whom she brought from Mobile rushing toward the exit.

108.    Ashley called after Goolsby to ask what he needed, and he responded that he had been looking for someone else (in Ashley's office, apparently).

109.    Shortly after Goolsby tried to sneak into Ashley's office after hours, McClung showed up unexpectedly and knocked on Ashley's door.

110.    McClung said that she got a "tip" about Ashley receiving a subpoena—the second comment about the subpoena that struck Ashley as odd.

111.    Ashley's predecessor asked if she should leave while they discussed the subpoena, but McClung told her, "No, you're fine."

112.    McClung asked Ashley to make her a copy of the subpoena.

113.    While McClung reviewed the subpoena, she said that it wasn't worded exactly how it should have been.

114.    McClung's statement about what the subpoena was supposed to say raised Ashley's suspicions for a third time.  Ashley didn't see any legitimate reason why McClung would have advanced knowledge of DA Billy's subpoena.

### Ashley's Boss Shared the Subpoena with the Board

115.    After Ashley received the subpoena, she called Rochelle Richardson, the Board's Chief School Financial Officer at the time, whom the subpoena also named as a records custodian.

116.    Richardson asked Ashley to send her a copy of the subpoena.

117.    Richardson then forwarded a copy to Cindy.

118.    Cindy was surprised by the subpoena and suspected that—much like the surprise vote on McClung's contract extension—only half the Board was in the dark.

119.    To make sure that the remainder of the Board knew what was going on, Cindy sent a copy of the subpoena to the other three members who voted against McClung, including Sherry.

120.    Cindy saw no issue with forwarding the subpoena to her fellow Board members because, again, the subpoena included no indication that it was issued by a grand jury, confidential, or could not be shared or discussed.

121.    Sherry would eventually forward a copy to Don, the reporter at *Atmore News*.

122.    The next day, September 20, 2023, McClung texted a colleague and revealed several things that she asked her colleague to keep secret:

      a.    The subpoena was related to a complaint levied by Board member Coleman Wallace.

    b.  McClung received a copy of the September 19 subpoena plus copies of four other subpoenas.

    c.  McClung had already discussed the subpoena and the audit with DA Billy and Sheriff Jackson.

    d.  One of the state auditors tried talking to DA Billy about McClung's unscrupulous behavior, and DA Billy turned around and told McClung.

    e.  Sheriff Jackson was targeting the former administration, and McClung was confident the staff she brought from Mobile had nothing to worry about.

**DA Billy Threatens to Punish Board Members Who Opposed McClung**

123.    On September 21, 2023, two days after DA Billy subpoenaed the Board records, he sent a threatening letter on his official letterhead to each Board member, "RE: Recent Audit."

124.    In the letter, DA Billy said he's concerned about "statements which are being made in the community by school board members" about the recent audit.  And he complained about "statements spread in the community" with "no basis whatsoever" that "are motivated by a personal agenda or some type of personal gain."

125.    Specifically, Billy said that certain Board members "stated that money was misspent or misappropriated and that the matter would be presented to a Grand Jury and that the School Board Superintendent, Michele McClung, could be indicted and arrested."

126.    Billy assured the Board that he spoke with the auditors himself and confirmed that "there was nothing that should be presented to a Grand Jury."

127.    He then warned: "I do have complete control of the Grand Jury in Escambia

County, Alabama," before adding that he might, at some point, bring other matters before a grand jury that he's "not at liberty to discuss."

128.    Importantly, DA Billy's warning revealed that, despite what he would later claim, he had not yet presented matters concerning the Board to a grand jury.

129.    He also foreshadowed the charges he would later bring, cautioning that any investigation he conducted "would be protected Grand Jury information and a Class C felony if divulged by a Board Member."

130.    The Alabama law criminalizing the divulgence of grand-jury secrets, however, applies only to grand jurors, witnesses, and court reporters.  It's not illegal for anyone else to discuss grand-jury proceedings.

131.    In his letter, DA Billy also defended McClung.  He asserted that McClung "has the best interest of the children at heart and she has accomplished more in her short term than others have in years."  "I have worked with McClung on several issues," Billy said, "and have found her to be extremely professional, ethical and very transparent when dealing with issues."

132.    The letter ended with more warning and innuendo: "In my professional opinion, a failure to renew her contract would not be in the best interest of the children of the school system.  Each Board Member was elected and took an oath to make sound decisions for the betterment of our education system, not to play politics to receive a benefit for themselves or a family member.  It is time to carry yourself as a professional and live up to your oath of office and keep this progress in motion."

**October 12 Board Meeting – Vote 2**

133. The School Board's meeting on October 12, 2023, was unusually packed because McClung and her allies asked their powerful friends in the community to voice their support.

134. Sheriff Jackson and DA Billy were in attendance. It was unusual for either man to attend Board meetings.

135. At the beginning of the Board meeting, DA Billy gave prepared remarks in which he praised McClung, criticized Board members for negative things they'd said about McClung, and warned the Board that a vote against McClung was against the law.

136. Billy began his remarks by acknowledging how unusual it was for him to be there, given that he "would normally not get involved in things of this nature, as far as an employment situation."

137. This acknowledgement was about the only thing Billy said that was right— his intervention at the Board was, in fact, unprecedented. In all his time as district attorney, he had never showed up to a Board meeting to speak in favor of a specific employee's contract, and he had never used the public-comment period to threaten Board members.

138. Billy claimed he was acting unusually because "people in the communities have been hearing things from, uh, not all the board members, but some board members— things about Ms. McClung, vicious personal attacks, and things that she had done and that she was going to be indicted by a grand jury."

139. Billy brought up the audit again, assuring the Board that he "talked to the

auditors" himself and "they found nothing."

140.    Then, after bemoaning "Washington politics" coming to Escambia County, DA Billy threatened to retaliate against anyone who opposed his political ally: "I don't control much, but I do control the grand jury of this County."

141.    Billy promised that he would not bring McClung's actions before a grand jury but that "there's other matters that *will* be brought before a grand jury."

142.    Once again, DA Billy's comments revealed that there was not yet a grand-jury investigation into the Board.  Yet, he claimed that he was "not at liberty to discuss" his other investigation "because those are secret by law, that's a secret investigation."

143.    Billy then complained about the public speech of certain Board members, saying, "It disturbs me though that public officials that would be out telling something that is just not so, and I have statements and affidavits stating what was told to them."

144.    After briefly singing McClung's praises, DA Billy returned to warnings.  He waved a copy of the threatening letter he sent the Board on September 21, 2023, saying, "I hope you've read it.  I hope you didn't just put it in the shredder.  And I meant every word I said in it."

145.    DA Billy then warned that, in his view, opposing McClung was illegal: "You're gonna throw [McClung] to the curb?  And also in my letter I stated that your oath of office you took.  Did you take that lightly?  If you look under Alabama Code 16.1-41.1, look at your duties as a board member.  Look at that.  That's what you took an oath of office to uphold.  And I look under the section (D), under (A), (B), and (C), that each decision, action, and vote taken, or made as a board member of a local board of education, shall be

based solely on the needs and interests of the students or the system.  You people that are voting … Let me move on to one more one, because voting no, is that what your interest is?  I don't think so.  [Subsection] (B) that no decision, action, or vote shall be taken or made to serve or promote the personal, political, or pecuniary interest of the member.  And that each decision, action, and vote shall be based on the interest of the school system as a whole.  Is that what you're voting for? As Reverend said, you keep changing horses in the middle of a stream, and undoing the progress of this thing?  What did you take an oath of office to do?"

146.    Billy concluded: "So, my recommendation as district attorney and my history of working with this woman is to renew her contract."

147.    One person clapped.  Then, former Flomaton Mayor Dewey Bondurant stood and said he understood that Cindy was "the one pushing this.  What I've been told, Ms. [Cindy] Jackson is the one pushing y'all to do this.  My opinion as a former mayor is this is wrong.  The Town of Flomaton, they have called me, and they support Ms. McClung."

148.    Alabama State Senator Greg Albritton spoke next.  He presented McClung with a $72,172.72 check for the district, which he said was thanks to the progress the district made under McClung.

149.    Like DA Billy had before him, Senator Albritton also volunteered that, for some reason, he also spoke with the auditors and "everything was fine, there was no issues or problems or difficulties there."  Senator Albritton concluded by assuring McClung that she had all his support.

150.    When it came time to vote on McClung's contract, Board President Benjamin remarked presciently, "Today's meeting can go down in history as one of the greatest meetings that we've had here at this board table, as a board, to do what is right for the students of Escambia County."

151.    The Board held another roll-call vote, and the result remained the same: 4-3 against renewing McClung's contract.

152.    Following 10 seconds of silence, President Benjamin remarked, "What a travesty."

153.    Benjamin then asked rhetorically for permission to vent.  He, too, reminded the Board members of their oath, that they "laid their hand on the word of God, that they would do what was right."

154.    Board member Mike Edwards also agreed with "Mr. Billy" that the Board members who voted no violated their oath of office.

155.    Edwards said he was ashamed of everyone who voted no, directing his remarks specifically to Sherry.

156.    Sherry responded by explaining that she "vot[ed] for the employees in this system. … I mean, we've got a lot of people speaking here—I have not had one employee get in touch with me and say, 'Gee, I wish you would change your vote.'  Everybody has said we need new leadership.  I'm talking about the employees who are teaching our kids. There's been a lot said about the evaluation, and Ms. McClung did get a satisfactory.  But we need excellent.  Why are we settling?  Why are we so happy about satisfactory on an evaluation when we're talking about our kids?  I will say this: Ms. McClung is one of the

smartest people I have ever served with.  I will give her that.  But I just think the leadership … needs to change."

157.    Board member Wallace also called it a travesty and suggested that the members who voted against McClung violated their oaths of office.

158.    Edwards and Wallace both said the Board needed a new composition.  (They would get their wish, as Edwards and Board President Danny Benjamin were both voted off the Board when they were up for reelection in 2024.)

159.    Former Mayor Bondurant then stood back up and interrupted, "I think the people that said no should be ashamed of themselves."

160.    As Cindy left the meeting, Sheriff Jackson told her, "Cindy, we're on different sides."  He then turned and told the people behind her that "she'll never get reelected in Escambia County."

161.    After the meeting, Board member Edwards again singled out Sherry and Cindy in the newspaper, accusing them of running a "propaganda campaign" against McClung and spreading "fabricated untruths" throughout the County.

162.    Former Mayor Bondurant continued to target Cindy after the meeting.  He left Cindy a voicemail saying that she's "one mean woman."  He told her he would do everything in his power to keep her from being reelected because she "did not treat Ms. McClung with grace" and because she was "mean and ugly" and "has no business" being on the school board.  The only word Cindy had said the entire meeting was "no."

163.    Former Mayor Bondurant also called Sherry to call her "vindictive."  And he

canceled his advertisements with *Atmore News*.

**DA Billy and Sheriff Jackson Move to the Next Phase of Their Retaliatory Scheme**

164.    Following the second vote against McClung, DA Billy and Sheriff Jackson made good on their threats of retaliation.

165.    A week after the vote, on October 20, 2023, at the instruction of DA Billy and Sheriff Jackson, Deputy Arthur Odom sought and obtained warrants to seize and search Sherry's and Cindy's cell phones.

166.    DA Billy had used his investigatory powers to subpoena Sherry's phone records to figure out how frequently she talked to Cindy on the phone.

167.    The subpoenaed records, however, did not show evidence of any wrongdoing.

168.    There was no probable cause to support the search warrants, something any reasonable officer would have known.

169.    Deputy Odom should have also known that the warrants were politically motivated, as DA Billy and Sheriff Jackson had made their plans plain publicly.

170.    Deputy Odom's warrant applications said that DA Billy had subpoenaed Sherry's phone records and saw that she exchanged about 40 calls with Cindy between September 11 and September 28.

171.    The warrant application did not indicate whether the calls were even answered, or if the 40 calls included missed calls, too.  The two women often play phone tag because neither can answer when the other calls.

172.    Moreover, Deputy Odom's warrant application did not—and, indeed, could

not—allege the contents of these phone calls.

173.    Instead, the warrant application reasoned *ipse dixit* that Sherry and Cindy are both members of the Escambia County School Board and that "it is believed that Digman [sic] and Jackson held private conversations regarding the vote and outcome of the Superintendent vote."

174.    These phone calls, according to Deputy Odom, violated Alabama's Open Meetings Act, which requires governmental bodies' deliberative processes to be open to the public.

175.    The Alabama Open Meetings Act does not apply to private conversations between two school board members.  Indeed, the law applies only when a quorum of a governmental body is present, and two school board members do not establish a quorum.

176.    Sherry and Cindy's phone calls, even if they did discuss McClung's contract (and, again, Deputy Odom presented no evidence suggesting they did), do not implicate the Alabama Open Records Act, let alone violate it.

177.    And besides, the Open Meetings Act is a civil statute that does not carry criminal penalties.  It's enforced through a civil process that private citizens can initiate.

178.    Phone records showing that Sherry and Cindy called each other were not evidence of criminal activity, something any objective officer would have known.

179.    Nor is it clear what evidence could be found on the phones that could reveal the topic of prior phone calls.  Deputy Odom's affidavit did not suggest that either woman recorded their calls or sent written messages in violation of the Open Meetings Act.

180.    Deputy Odom included no limits on the scope of the search.  As a result, the

officers enforcing the warrant were not required to limit which applications they checked, there was no temporal limit, and there was no keyword-search or "preview search" limitation to ensure that officers viewed only responsive files.

181.    Nor did Deputy Odom's application include any personal knowledge of criminal activity to which he could swear under oath.  He did not even have second-hand or hearsay evidence to support his allegation.

182.    While the search-warrant application for Sherry's phone was based solely on an unsubstantiated and factually impossible violation of the civil Open Meetings Act, the application for Cindy's phone included a second accusation: revealing grand-jury secrets.

183.    The entirety of the purported probable cause to believe that Cindy revealed grand-jury secrets was a single sentence: "It has also been reported Cynthia Jackson has made public statements about certain Grand Jury Indictments that have not yet occurred which is a violation of Alabama Code 12-16-214(4)."

184.    And again, there was no limitation on where on Cindy's phone officers could search for evidence to confirm this "report."

185.    Deputy Odom concluded, without any personal knowledge or evidentiary support, "These statements are believed to be on her cellular phone as well."

186.    A local magistrate signed off on these baseless and invalid search warrants, and Sheriff Jackson's office executed them the following Monday, October 23, 2023.

187.    On October 23, 2023, Sherry was at the Atmore Community Hospital visiting Myrna Monroe, her co-owner of *Atmore News*.

188.    Deputy Odom and another officer came to Myrna's hospital room and seized

Sherry's phone.

189.   Sherry told Deputy Odom that she uses her phone for business, as a journalist.  But it didn't make a difference to Deputy Odom.

190.   Later that day, Deputy Odom called and asked Cindy to come to the station to answer one question.  He said he wasn't allowed to ask over the phone but assured her that she was not under investigation.

191.   When Cindy got to the station, Deputy Odom was suddenly unavailable. Deputy Derek Lowry brought Cindy and Charles into an empty office, sat them down, and seized Cindy's phone with one hand and handed her the warrant with the other.

192.   Sheriff Jackson sent Cindy's and Sherry's phones to Jackson, Alabama, to download the phones' content with no restrictions on the scope, even though the warrant was ostensibly to confirm only whether the two women spoke about school business.

193.   It was eight days until Sherry and Cindy got their phones back on October 30, 2023.

194.   Eight days without a phone was critical for Cindy since she had surgery on October 24.  She had to let her doctors (and her children) know that they needed to call her husband's phone to reach her because the police had seized hers.

195.   In addition to the inconvenience and embarrassment, Cindy and Sherry both worried about the police having free access to every personal and confidential thing on their phones.

196.   Sherry is a journalist and uses her phone for work.

### *Atmore News* Publishes an Article About the September 19 Subpoena

197.   On October 25, 2023, *Atmore News* published an article that Plaintiff Don Fletcher authored entitled, "BOE investigations."

198.   The article largely recounted the events from the October 12 Board meeting, including DA Billy's unusual remarks.  It also discussed the September 19 subpoena.

199.   Sherry determined that *Atmore News* should publish the article because, in her editorial view, it was newsworthy that the subpoena revealed that DA Billy was targeting people who worked in the administration preceding McClung's appointment.

200.   Don's article noted that Billy confirmed that he was conducting a criminal investigation into the Board's handling of COVID-relief funds.

201.   Fatefully, Don's article also revealed that *Atmore News* had obtained a copy of the subpoena that DA Billy issued to Ashley and Rochelle Richardson on September 19 for documents relating to COVID funds.

202.   Don concluded his article by reporting that DA Billy said more about his *other* investigation into the Board would "come out soon enough."

### Deputies Odom and Durden Seize Ashley's Phone Without a Warrant

203.   The day after *Atmore News* published Don's article, Thursday, October 26, 2023, Deputies Odom and Durden showed up to Ashley's office and brought her to the Sheriff's Office for questioning.

204.   Ashley had seen Don's article in *Atmore News* about the investigation into the COVID funds and assumed the deputies were questioning her as part of that investigation into the School Board.

205.    But it soon became clear to Ashley that the deputies were getting at something else, including things she didn't know.

206.    Ashley asked if she was free to leave, and the officers told her she could.

207.    Ashley walked back to her office, and Deputies Odom and Durden followed her in their truck.

208.    When they got back to Ashley's office, the officers told Ashley that they needed to take her cell phone as part of their investigation.

209.    Ashley asked whether the officers needed to get a warrant or a subpoena to take her phone, and they told her they did not need a warrant.

210.    Ashley believed the officers were telling her the truth.  (They were not.)

211.    As Ashley wrote down her father's and children's numbers, officers warned her not to delete anything.

212.    She handed over her phone in response to what she thought was a lawful command because the officers made her feel like she had no choice.

213.    The officers then demanded that Ashley give them her password, so she wrote it down, still feeling like she had no choice.

214.    Ashley asked the officers how they would get in touch with her, and the officers joked, "We'll call you," as they snickered to themselves.

215.    Sheriff Jackson's office downloaded all the data off Ashley's phone, and they maintained possession of the phone until after Ashley's case was eventually dismissed.  The warrantless seizure left Ashley without her phone for about 6 months, causing her to purchase a new phone and a new phone line.

216.    Ashley contacted an attorney and set up a consultation for the day after Deputies Odom and Durden seized her phone.

217.    The conspirators, however, were already planning a round of arrests for the next day—a Friday, just as Sheriff Jackson had promised a month prior at the local GOP meeting.

### Ashley's Arrest

218.    The day after police seized her phone, October 27, 2023, Ashley and her husband, Ryan, were preparing to leave for a trip to Disney World followed by a cruise.

219.    While the couple was running errands, they noticed that they were being followed by Deputy Durden.

220.    Feeling stressed given Deputy Durden's warrantless seizure of Ashley's phone the day before, the couple hurried to finish their errands.

221.    At 1:00 p.m., Ashley and Ryan met with the attorney they just hired.

222.    While they were in the attorney's office, Ryan got an alert from the couple's doorbell camera.  The video showed Sheriff's deputies knocking on their front door and demanding that Ashley come outside.

223.    Ashley's new attorney called the Sheriff's Office and negotiated Ashley's surrender.

224.    Ashley was arrested at 2:38 p.m. that Friday for revealing grand-jury evidence in violation of Alabama Code § 12-16-215.

225.    According to Deputy Odom's sworn criminal complaint, Ashley "did on or about September 19, 2023, being a past or present grand juror, grand jury witness, or

grand jury reporter, unlawfully and willfully … disclosed or divulged … knowledge or information pertaining to a grand juror's question, consideration, debate, opinion or vote on a case or evidence, to-wit: provided Grand Jury Investigation information to member of the media which was before the grand jury of Escambia County, Alabama."

226.    There was no arguable probable cause for Ashley's arrest.  Any reasonable officer would have known that the criminal code cited in the complaint did not remotely apply to Ashley or her conduct.

227.    There was no grand-jury evidence for Ashley to reveal.

228.    There was no grand jury.

229.    Ashley was not a grand juror, grand-jury witness, or grand-jury reporter.

230.    Ashley was not sworn to secrecy and did not violate that oath.

231.    The September 19 "DISTRICT ATTORNEY'S SUBPOENA" that DA Billy issued was not grand-jury information and was not confidential.  Nothing on the document indicated that DA Billy issued it as part of a grand-jury investigation or that it was otherwise confidential.

232.    All the actual grand-jury documents that were eventually issued in this case were signed by a grand-jury foreman and stated explicitly that they were issued on behalf of other grand jurors.  Only DA Billy signed the September 19 subpoena.

233.    There was no grand jury convened when Billy issued the September 19 subpoena, as indicated by the subpoena's reference to the district attorney's powers and confirmed by Billy's September 21 letter and his public comments at the October 12 Board meeting.

234.   Indeed, the power on which DA Billy relied applies only when "the grand jury is not in session."

235.   The criminal charge also lacked a basis in fact: Ashley did not provide the September 19 subpoena to the media.

236.   The only person Ashley shared the DA's subpoena with was Rochelle Richardson, who was also named in the subpoena.

237.   The Sheriff Defendants had no evidence whatsoever that Ashley shared the subpoena with anyone other than Rochelle Richardson.

238.   Any objectively reasonable officer would have known that there was no probable cause to arrest Ashley for revealing grand-jury secrets because there was no grand jury and the September 19 subpoena was not a grand-jury secret.

239.   The purported basis for Ashley's arrest was entirely fabricated by DA Billy, Sheriff Jackson, and Deputy Odom who swore to the criminal complaint.

240.   Defendants all knew there was no legitimate basis to arrest Ashley.

241.   Without the misleading statements that made it seem like Ashley was somehow subject to and violated the grand-jury-secrecy laws, no warrant could have issued for Ashley's arrest.

242.   Sheriff Jackson's deputies booked Ashley into jail, where a guard led her to a small room with three walls and a shower head.  Standing at the entrance to the open room, the officer instructed Ashley to strip, shower in front of her, and squat to make sure she was not carrying contraband in her body cavity—all in full view of anyone who walked by.

243.   After a few hours, Ashley's attorney managed to get her a bond hearing late on Friday afternoon.

244.   The guards shackled Ashley's ankles and shackled her hands to her waits, and they led her to the court.

245.   The judge agreed to let Ashley post bond.  He commented that Ashley's attorney "worked a miracle" to get her a hearing so late on a Friday.

246.   The guards then brought Ashley back to the jail, still in shackles.

247.   They led Ashley through the men's holding cell and took her mugshot and fingerprints.

248.   The officers then took Ashley back to the open shower stall, where they gave back her clothing to get dressed and leave because she'd posted bond.

249.   Ashley and Ryan missed their cruise, which was non-refundable.

250.   As a condition of her bond, Ashley could not leave the state without permission, so she and Ryan would miss out on other trips as well.

### Don's Arrest

251.   Don was at *Atmore News* by himself on Friday, October 27, 2023, because Sherry was still helping care for Myrna at the hospital.

252.   Early that afternoon, he opened the door to find Deputies Odom and Rabren there to arrest him.

253.   Although DA Billy and Sheriff Jackson routinely let criminal suspects surrender at the Sheriff's Office—including people suspected of capital murder, murder, multiple attempted murders, discharging a firearm into a vehicle, identity theft, and theft

35

by deception—they did not provide that leniency to Don.

254.    The arrest was not a total surprise for Don, though, as a fellow journalist had warned him that DA Billy bragged about his plans to have Don and Sherry arrested.

255.    In this journalist's conversation with DA Billy, the district attorney revealed information about his ongoing grand-jury investigations into Don and Sherry.    The journalist told Don about DA Billy's cases against Sherry and then warned, "I think they might be going to arrest you, too, for that article you wrote."

256.    Much like Ashley, the Deputies Odom and Rabren arrested Don for revealing grand-jury secrets even though there was no grand jury and Don had not obtained or revealed any grand-jury secrets.

257.    And much like Ashley, Don was not a grand juror, grand-jury witness, or grand-jury stenographer.    He was not bound by any secrecy laws.

258.    Don did not obtain or disclose any grand-jury secrets.    The grand-jury secrecy law did not even apply to him.

259.    It was not illegal for Don to publish an article disclosing the existence and subject-matter of Billy's September 19 subpoena.

260.    It would not have been illegal for Don to publish his article even if the subpoena had been issued by a grand jury.

261.    There was no legitimate basis for Don's arrest, and any objectively reasonable officer would have known that.

262.    The deputies handcuffed Don and put him in the back of a cruiser.

263.    On the drive to the jail, it occurred to Don that the arrest could be the end

of his career as a reporter in Escambia County, since criminal charges can make it especially hard to keep a public-facing job in a small town.

264.    Don was processed into the jail around 2:30 p.m., had his fingerprints and mugshot taken, and then sat on a bench in a holding cell for the next six hours.

### Sherry's First Arrest

265.    After Deputies Odom and Rabren arrested Don, they handed him off to another set of deputies and returned to Atmore to arrest Sherry at the Atmore Community Hospital.

266.    Like with Don, Sheriff Jackson did not afford Sherry the chance to turn herself in like they do regularly for people suspected of much more serious and dangerous crimes.

267.    The Deputies Odom and Rabren arrived at Myrna's hospital room and told Sherry she was under arrest.

268.    Sherry asked Myrna to call Don, but Deputy Odom interjected that, if she was talking about Don Fletcher, he was already in jail.

269.    Fortunately, Myrna got word to Cindy's husband, Charles, who got a head start on finding a bail bondsman.

270.    Deputies Odom and Rabren led Sherry to their squad car, handcuffed her, and drove her from Atmore to the Escambia County jail in Brewton.

271.    Just like with Ashley and Don, DA Billy and Sheriff Jackson had Sherry arrested for revealing grand-jury secrets by publishing Don's article.

272.    A criminal complaint signed by Deputy Odom alleged as follows: "On or

about October 25, 2023, being a past or present grand jury, grand jury witness, or grand jury reporter, unlawfully and wil[l]fully … revealed, disclosed or divulged or caused to be revealed, disclosed, or divulged, knowledge or information pertaining to a grand juror's question, consideration, debate, opinion or vote on a case or evidence, to-wit: approved an article containing Grand Jury Investigation information and allowed the article to be printed in the Atmore News which was before the grand jury of Escambia County, Alabama."

273.    Just like Ashley and Don, Sherry was not privy to any grand-jury secrets and did not reveal any.

274.    Nor was Sherry a grand juror, a grand-jury witness, or a grand-jury reporter. The law did not apply to her.

275.    Sherry's decision to print Don's story in *Atmore News* was not criminal.

276.    Any reasonable officer would have realized there was no probable cause for Sherry's arrest because publishing a news article about a district attorney's subpoena is not a crime.

277.    When Sherry got to jail, she saw Don through a large window into the men's holding cell.  Don thought she must be there to free him from jail, but Sherry held up her handcuffs to show Don she was there to join him behind bars.

278.    Don's face fell as their reality set in.

279.    The booking officer then told Sherry she would not get to see her attorney or a judge, and that she would be in jail until Monday because no one was available on a Friday afternoon—just as Sheriff Jackson described his plan at the GOP meeting a month

prior.

280.    A short time later, a female officer escorted Sherry through the men's holding cell to the shower, directed Sherry to remove all her clothes, handed her a rag, and instructed Sherry to shower.

281.    As Sherry showered in front of the officer, the officer made her squat.

282.    Because there was no door to the shower, male officers could see inside as they walked by.  Some shielded their eyes.

283.    Officers then gave Sherry an orange jumpsuit, size XL, that snapped only at the top and near her navel.

284.    Officers led Sherry back and forth through the men's holding cell to take her mugshot and then her fingerprints.  Sherry had to hold her orange jumpsuit closed with her hands as she walked through the holding cell filled with eight to 10 men.

### Sherry & Don Manage to Avoid Eating Sheriff Jackson's Hotdogs

285.    While Don and Sherry sat in jail, Charles worked with their attorney and a bail bondsman to get them out.

286.    At 6:15 that evening, Sheriff Jackson told Sherry and Don that they could be released that day if they posted bond in the next 15 minutes.

287.    Their attorney managed to reach the judge who signed their facially invalid arrest warrants.  When asked to give them a bond hearing that evening, the judge said he would "have to pray about it."

288.    Ultimately, the judge agreed to set their bond at $10,000 each.

289.    Although Cindy's husband, Charles, was not able to meet the 6:30 deadline,

a bondsman managed to get Sherry and Don out of jail around 8:00 that night.

290.    Despite how slowly and reluctantly the Sheriff's Office typically provides information about arrests to the media, the Sheriff's Office put out a press release and posted Sherry's and Don's mugshots on Facebook before they even made it back to Atmore. Indeed, each time Plaintiffs were arrested or charged, Sheriff Jackson tipped off the media more quickly than he typically does for other new arrests or charges.

291.    The following Monday, October 30, 2023, the court held a hearing and set conditions for their bond, including that Sherry and Don, two journalists, could have "no communications about ongoing criminal investigations including schools and other."

292.    Don and Sherry requested a preliminary hearing to determine if there was probable cause to support their arrests, which the court scheduled for December 4, 2023.

### Sherry's Second Arrest

293.    On November 1, 2023, Sherry was arrested again—this time on ethics violations.

294.    DA Billy had convened a grand jury to investigate Sherry on two counts of ethics violations.

295.    On information and belief, DA Billy used the grand jury's investigative functions to subpoena records from the Board and interview at least one Board member as a "witness."

296.    On the first count, the indictment charged Sherry with using her position on the Board for financial gain by selling the Board advertisement space in *Atmore News*.

297.    There was no probable cause to believe that Sherry committed an ethics

violation by *Atmore News* selling ad space to the Board.

298.    Indeed, the Board had been purchasing ad space in *Atmore News* since before Sherry's time on the Board, continued to purchase ad space after Sherry lost her seat on the Board in 2016, and continued to purchase ad space all the same once Sherry returned to the Board in 2021.

299.    *Atmore News* charged the Board the same rate as all its other advertisers, and its rate that was below what comparable newspapers in the area charged.

300.    The Board even hired outside counsel in 2022 after Sherry returned to the Board and sought an ethics opinion from the State to ensure that the ad sales did not violate ethics rules.

301.    The Assistant General Counsel for Alabama's Ethics Commission confirmed that the sales were lawful, stating: "[T]here is nothing in the Ethics Act that would prohibit the Board of Education from purchasing ads in a local newspaper that is partially owned by a Board member" provided that the Board member doesn't personally direct the Board to purchase the ads and abstains from working on either side of the transaction.

302.    The Ethics Commission also confirmed that the law placed no financial cap on the transactions "so long as the amount is commercially reasonable and does not indicate a use of office for personal gain or corrupt influence."

303.    McClung, who was in contact with DA Billy about the arrests of the people standing in the way of her new contract, knew that the Ethics Commission concluded the sales were lawful.  McClung had reviewed the ethics opinion the year before Sherry's arrest and confirmed in writing on October 9, 2022, that Sherry was "in the clear and following

best practices."

304.    The second count of the indictment largely tracked the first, charging Sherry with obtaining "U.S. Currency for payment of advertising from a subordinate, to-wit: Superintendent John Knott and/or Chief School Financial Officer Julie Madden[.]"

305.    The second charge was baseless for the same reasons as the first.

306.    The charge was also factually impossible because the indictment specifically alleged that Sherry solicited these advertising payments from McClung's predecessor, who was no longer superintendent when Sherry returned to the Board in 2021.  The last time John Knott's administration purchased advertisements from *Atmore News* while Sherry was on the Board was at least seven years prior, in 2016, if not earlier.

307.    In other words, Billy's attempt to avoid implicating McClung in the indictment inadvertently placed the charge far outside the four-year statute of limitations.

308.    Sherry's attorney accompanied her to surrender herself at the jail in Brewton.

309.    Sheriff Jackson's Office booked Sherry again, took her mugshot again, and took her fingerprints again.

310.    This time, at least, there was no shower.

311.    One deputy at the jail told Sherry, "We all know this was political."

312.    Sherry was then released after she put up real property as an additional bond.

### DA Billy Uses an Obscure Power to Impeach Sherry

313.    In addition to DA Billy's use of the grand jury to investigate and indict McClung's political rivals, he also tried to use the grand jury to remove Sherry from office.

314.    DA Billy used the grand jury's investigatory function to investigate Sherry for the purpose of gathering evidence and creating a pretextual basis to remove her from the School Board.

315.    On information and believe, that investigation included subpoenaing the Board for records and speaking with at least one Board member.

316.    As a result of DA Billy's investigation, on October 27, 2023—the same day as Sherry's first arrest—Billy filed a bill of impeachment in the Circuit Court of Escambia County.

317.    The bill of impeachment laid out three reasons why DA Billy's grand jury agreed that Sherry should be removed from office: (1) willful neglect of office; (2) corruption in office; and (3) crime of moral turpitude.

318.    On the first ground, the bill listed 12 reasons why McClung was a great superintendent, all of which, it alleged, Sherry ignored by voting against McClung's contract renewal: "Digmon voted not to renew McClung's contract, ignoring all the positive things that she had accomplished to improve the school system for the students." According to the bill, McClung's "contract should have been renewed and a vote not to renew was not in the best interest of the students or the school system as a whole."

319.    The bill then alleged several other ways that Sherry willfully neglected her office, including that she didn't adequately explain her vote against McClung and that she based her decisions on "her personal opinions and not that of the children or the school system as a whole."

320.    DA Billy's grand jury also impeached Sherry for not publishing favorable

43

stories about McClung.  Specifically, the bill charged Sherry with "violating her duty as a school board member by refusing to publish articles which promoted the school system and the Superintendent[.]"

321.   The basis for the second ground for impeachment was the same as the ethics indictment: Sherry "sits on the board and has always voted to approve the monthly financial expenditures and based on board minutes[] has never abstained from voting to approve payments to her own business."

322.   The third ground for impeachment charged that Sherry was somehow the only Board member aware of the advertisements and that the Board would not have approved the sales had the other members known what they were voting on.

323.   DA Billy's impeachment of Sherry was unprecedented.

324.   The Alabama Association of School Boards called Sherry's impeachment "corrupt."  The Association's President said it was the "most outlandish situation" of outside influence on a school board that she'd seen in her 37 years on the job.

325.   The district attorney in Escambia County has never impeached anyone.

326.   No county school board member in Alabama has been impeached in the last 18 years.

327.   And that impeachment 18 years ago was in Mobile, where a school board member misused over $9,000 in school funds to purchase Mardi Gras trinkets and 7,000 Moon Pies without authorization and then, allegedly, drove drunk on Mardi Gras, ran over the foot of an eight-year-old child, and fled the scene of the accident.

328.   On information and belief, no county school board member in Alabama was

ever impeached for political dispute over personnel matters.

329.    DA Billy would eventually dismiss the impeachment case against Sherry on February 22, 2024—the day after his recused himself due to his personal and private conflicts of interest.  He filed a motion in the court saying that because the "successful prosecution of her pending felony cases would have the same result as impeachment," "judicial economy would best be served" by dismissing the impeachment charges he brought.

### Cindy's Arrest

330.    On Friday, December 1, 2023, DA Billy's grand jury returned an indictment for Cindy's arrest based on the same grand-jury investigation.

331.    On information and belief, Cindy was not arrested at the same time as the other Plaintiffs because she had knee-replacement surgery that week and pushing a grandmother into jail in a wheelchair would have elicited too much sympathy for someone Defendants were trying to punish.

332.    The indictment charged Cindy with corruptly obtaining information pertaining to a grand jury, "to wit: obtained and disclosed information in a grand jury subpoena, in violation of § 12-16-215 of the Code of Alabama."

333.    There was no probable cause for Cindy's arrest.

334.    The grand-jury secrets statute did not apply to Cindy, as she was not a grand juror, witness, or reporter, and she was not privy to any grand-jury secrets.

335.    It was not a crime for Cindy to share the September 19 subpoena with her fellow Board members.

336.    Nor did Cindy obtain the September 19 subpoena by threat, by force, or by offering a reward.  The criminal complaint contained no evidence suggesting otherwise.

337.    Nor did Cindy obtain the September 19 subpoena with the intent of influencing a grand-jury proceeding, which would have been impossible since there was no grand jury, the subpoena was not issued by a grand jury, and there was nothing to indicate otherwise to Cindy or any other recipient.

338.    The reason DA Billy and Sheriff Jackson decided to have Cindy arrested was to retaliate against her for her speech and her political opposition to McClung, whom Billy and Sheriff Jackson had vowed to protect.

339.    Deputies showed up to arrest Cindy at her attorney's office.  After the officers refused to say why they were there, Cindy's attorney eventually called the sheriff and negotiated Cindy's ability to turn herself in.

340.    On Monday, December 4, 2023, Cindy was booked into the Escambia County Jail.

341.    Cindy was fingerprinted and given an orange jumpsuit for her mugshot. Because she was still recovering from knee surgery, deputies had to help hold her upright as she stood on a small stool to have her mugshot taken.

342.    Following her arraignment, Cindy was released the same day on a $25,000 property bond.

343.    Cindy had to receive special permission from the court to travel to her physical therapy appointments in Pensacola, Florida, to take her disabled veteran brother to his appointments in Florida, and to spend Christmas with her family in Kentucky.

**Billy's Grand Jury Indicts Don & Sherry to Prevent Their Preliminary Hearing**

344.    On December 1, 2023, the same day the grand jury indicted Cindy, the grand jury also returned indictments for Don and Sherry.

345.    The grand-jury indictments made the same charge as the criminal complaints from October: revealing grand-jury secrets.

346.    The indictments lacked any basis in probable cause for the same reasons as the criminal complaints from October.

347.    The purpose of bringing the indictment—in addition to punishing two journalists for their speech—was to keep Sherry and Don from having a preliminary hearing at which they could contest the lack of probable cause and obtain subpoenas for McClung and Deputy Odom.

348.    As discussed in ¶ 292, Sherry and Don had requested a preliminary hearing back on October 30.  That hearing was scheduled for Monday, December 4, and the court was set to consider Sherry's and Don's requests for subpoenas.

349.    By obtaining grand-jury indictments on the last business days before the preliminary hearing, DA Billy caused the court to cancel the preliminary hearing, thereby preventing Sherry and Don from challenging the basis for their arrests and obtaining the subpoenas.

**McClung Gloats About the Political Persecution Carried Out on Her Behalf**

350.    McClung made clear throughout the school district that she was happy that DA Billy and Sheriff Jackson arrested Cindy and Sherry.

351.    Through her gloating, McClung revealed that she knew DA Billy and Sheriff

Jackson would arrest Cindy and Sherry before they did so.

352.   On information and belief, McClung had advanced knowledge of the arrests—just like she had advanced knowledge of the September 19 subpoena—because DA Billy and Sheriff Jackson discussed their plans with her.

353.   DA Billy and Sheriff Jackson coordinated their retaliatory scheme to violate Plaintiffs' civil rights with McClung and, on information and belief, at least one Board member.

### The School Board Buys Out McClung's Contract

354.   On November 28, 2023, Loumeek White was elected to replace Danny Benjamin as Board President.  This was a month after the initial arrests of Ashley, Sherry, and Don, and just a few days before the indictment of Sherry, Cindy, and Don.

355.   The fact that McClung's allies arrested two Board members for opposing McClung made her position as superintendent untenable.

356.   So, on December 14, McClung agreed to have the Board buy out the remaining six months on her contract and to go on paid leave until January 31, 2024, so that her benefits would have time to vest.

357.   President White called a special meeting for the next day so that the Board could consider the deal.

358.   On a motion of Board member Kevin Hoomes, the Board voted unanimously to buy out McClung's contract, placed her on paid leave, and barred her from school property during her leave.

359.   The Board then voted unanimously to appoint an interim superintendent to

assume the position immediately.

360.    On January 31, 2024, the Board paid out the remainder of McClung's contract and officially terminated her employment.

### Sherry's Third Arrest

361.    On Monday, February 12, 2024, Sherry was arrested for a third time.

362.    The Sheriff's Office told Sherry's attorney that they needed Sherry to bring some paperwork to the jail.

363.    When Sherry arrived, a deputy asked her to come to "the other side," where another deputy came to get her mugshot and fingerprints again.

364.    When Sherry told the deputy that she'd already had both taken twice, the deputy responded, "But every time you're arrested, you have to have them done again." And that's how Sherry found out she was getting arrested for the third time.

365.    This time, the officers didn't even bother to make Sherry put on the oversized orange jumpsuit.  They let her hold it up over her clothes as they took her third mugshot.

366.    Sherry's third arrest was, supposedly, to reprocess her after Billy had reduced her bond on his own initiative.

367.    The true purpose for Sherry's third arrest was to humiliate, degrade, and punish her one last time before Billy finally admitted his conflicts of interest.

368.    Sherry was released after she paid a processing fee.

### Billy Recuses Himself for Professional and Personal Conflicts of Interest

369.    On February 21, 2024, the week after arresting Sherry a third time, Billy recused himself from all the criminal cases he filed against Plaintiffs.

370.   Billy filed a motion with the court admitting that he had to recuse based on "both a legal and a personal conflict" and that justice would best be served by his recusal.

371.   Nothing changed between February 12 when DA Billy had Sherry arrested a third time and February 21 when he recused himself.  Billy would have known about his personal and professional conflicts of interest the week before his recusal when he had Sherry arrested for a third time.

372.   The only notable change in circumstances around the time of Billy's recusal was that the Board finally paid out the remainder of McClung's contract.

373.   Following Billy's recusal, the Alabama Attorney General's Office took over the cases and dismissed all of them with prejudice within just 17 days.

## INJURY TO PLAINTIFFS

374.   Defendants willfully violated Plaintiffs' federally protected rights.  They knew or should have known that their conduct outlined in this complaint was unconstitutional.

375.   As a direct and proximate result of Defendants' deliberate, knowing, and reckless conduct, motivated by retaliatory animus, Plaintiffs have suffered violations of the First and Fourth Amendment rights.

376.   As a direct and proximate result of Defendants' First Amendment violations, Sherry, Cindy, and Don all had their speech chilled.  They had to restrict their protected speech about McClung and about Defendants.  Plaintiffs still restrict their public speech because Defendants still hold the very positions of power that they abused in this case. The chill on Plaintiffs' speech is objective, as Defendants' conduct caused at least one

potential candidate for office in Escambia County to stay out of the race for Board member Coleman Wallace's seat in the 2024 election.

377.    As a direct and proximate result of Defendants' Fourth Amendment violations, Plaintiffs were all arrested and spent time in jail (plus the time handcuffed in the back of police cruisers).  Sherry was arrested three times in total.  Ashley, Sherry, and Cindy had their phones seized for between eight days and six months and had police download all the data on their phones.  They had to hire attorneys, appear in court, and comply with restrictive bond conditions for nearly four months.

378.    As a direct and proximate result of Defendants' unconstitutional acts, motivated by retaliatory animus, Plaintiffs have suffered, and will continue to suffer, extreme and severe mental and emotional trauma, post-traumatic stress, anxiety, sleeplessness, behavioral changes, mental anguish, deterioration of health, and loss of enjoyment of life.  This damage includes the physical and emotional damage from the stress caused by Defendants' retaliatory scheme, plus the reputational damage of being branded as criminals while working in public-facing jobs.  This damage also includes a lasting fear of speaking out against those in power; Plaintiffs now know they must weigh the benefit of speaking out against the misuse of governmental power against the very real chance that they could be punished for doing so.

379.    Each Plaintiff also suffered pecuniary loss.  This damage includes but is not limited to the costs and fees associated with their arrest and court hearings, the costs associated with doctors' visits and medication, the costs of criminal-defense attorneys, payments to a bail bondsmen, the cost of new cell phones and a new phone line, the loss

of non-refundable tickets for cancelled trips, and the time and cost of expunging the records of Plaintiffs' baseless and unconstitutional arrests.

380.    Punitive damages are justified because Defendants' conduct was motivated by evil motive or intent, or it involved reckless or callous indifference to Plaintiffs' federally protected rights.

## CLAIMS FOR RELIEF

### COUNT I
### Retaliation in Violation of the First Amendment
**(Sherry, Cindy, & Don against Billy, Jackson & Odom in their individual capacities)**

381.    Plaintiffs reallege and incorporate the allegations in ¶¶ 25–380 of this complaint as if they are fully restated here.

382.    Using their respective law-enforcement authorities, District Attorney Billy, Sheriff Jackson, and Deputy Odom violated the First Amendment rights of Sherry, Cindy, and Don by retaliating against their protected speech.

383.    At all times relevant to this complaint, it was clearly established that people, including those elected to public office, enjoy a First Amendment right to engage in public political disputes, discuss political issues publicly and privately, voice their concerns with the performance of public officials, oppose public contracts, and speak to the press.

384.    At all times relevant to this complaint, it was clearly established that journalists enjoy a First Amendment right to publish matters of public concern, including disputes between public officials, the outcome of public meetings, and the existence and targets of criminal investigations.

385.    Motivated by a desire to silence, punish, and intimidate Sherry, Cindy, and

Don for exercising their First Amendment rights, DA Billy, Sheriff Jackson, and Deputy Odom deprived Plaintiffs of their clearly established rights under the First Amendment by (1) arresting them; (2) seizing Sherry's and Cindy's phones; and (3) impeaching Sherry. DA Billy had this same motivation for misusing the grand jury's investigatory function to further Defendants' retaliatory scheme.

386.   DA Billy and Sheriff Jackson publicized their plan to arrest and punish anyone who opposed McClung.   In doing so, they repeatedly identified Sherry's and Cindy's protected speech (*e.g.*, public criticism of and political opposition to McClung) as the basis for their retaliatory actions.

387.   After the Board voted not to renew McClung's contract, DA Billy, Sheriff Jackson, and Deputy Odom used the force of their offices to punish Sherry, Cindy, and Don for their protected speech.

388.   Along with their co-conspirators, DA Billy, Sheriff Jackson, and Deputy Odom conducted a sham investigation to make it look like law enforcement was conducting a legitimate investigation into McClung's predecessors rather than McClung and her allies.   This sham investigation into McClung's predecessors, which never materialized into any charges, was pretextual to arrest Sherry, Cindy, and Don, seize Sherry's and Cindy's phones, and impeach Sherry, in retaliation for their protected speech.

389.   The true motive for these investigations, seizures, arrests, and impeachment was to punish Sherry, Cindy, and Don for their political viewpoints and protected speech.

390.   The search warrants targeted Sherry and Cindy based on their private conversations.   The premise of the warrants was that it was illegal for Sherry and Cindy to

talk to one another about whether to retain McClung—something that Sherry and Cindy, as just two people, didn't have the power to decide. These conversations are obviously protected by the First Amendment.

391.    The basis for the retaliation against Sherry, Cindy, and Don was Plaintiffs' communication of non-privileged information. The charge of revealing grand-jury secrets punished them for sharing and disclosing information on a matter of public concern—communications which are protected by the First Amendment.

392.    Sherry and Don's charges, in particular, targeted their First Amendment right to publish news on issues of public concern.

393.    And Sherry's impeachment was also based on her protected speech: her political speech in opposition to McClung, her failure to publish articles that Billy deemed sufficiently complimentary of McClung, and her refusal to explain her political viewpoints in a way that DA Billy deemed adequate.

394.    DA Billy, Sheriff Jackson, and Deputy Odom knew or should have known that their conduct, the conduct of their co-conspirators, and the motivating force behind the decision to arrest Plaintiffs, seize their phones, and impeach Sherry was to punish Sherry, Cindy, and Don in retaliation for their protected speech, in violation of the First Amendment.

395.    DA Billy knew or should have known that it violated the First Amendment to misuse the grand jury's investigatory function to further the conspiracy, gather evidence, and create the pretext for Defendants' retaliatory actions.

396.    It was clearly established at the time of DA Billy, Sheriff Jackson, and Deputy

Odom's actions that retaliating against individuals by maliciously procuring a search warrant, abusing official processes for ulterior purposes, seizing phones, and charging and arresting people based on their political speech violates the First Amendment.

397.    It was also clearly established at the time that government officials violate the First Amendment when they abuse legal processes to pressure elected officials to resign in retaliation for their political positions.

398.    The facts alleged in this complaint demonstrate that Defendants' investigation was pretextual and that DA Billy, Sheriff Jackson, and Deputy Odom were truly motivated by a desire to punish Sherry, Cindy, and Don for their constitutionally protected speech.

399.    There was no probable cause or other legitimate basis to arrest Sherry, Cindy, or Don.

400.    There was no probable cause to search and seize Sherry's and Cindy's cellphones.

401.    There was no legitimate basis to impeach Sherry.

402.    Nevertheless, DA Billy, Sheriff Jackson, and Deputy Odom maliciously procured search warrants and filed criminal complaints against Sherry, Cindy, and Don.

403.    Moreover, DA Billy misused the grand jury's investigatory function to gather evidence and create the pretextual basis for Defendants' retaliatory scheme.

404.    DA Billy, Sheriff Jackson, and Deputy Odom also arrested Sherry and Don in public (and tried to arrest Cindy at her attorney's office) rather than allowing them to turn themselves in, as the Sheriff's Office routinely allow people who have committed much

more serious crimes that pose a greater risk to the community.  Defendants then publicized Sherry's, Don's, and Cindy's arrests to the media (in both Escambia County and in Mobile) more readily than they typically disclose new arrests and charges to the media.

405.    But for DA Billy, Sheriff Jackson, and Deputy Odom's retaliatory animus toward Plaintiffs' protected speech, they would not have investigated them, seized their phones, arrested them, or impeached Sherry.

406.    Even if probable cause existed—which it obviously did not—DA Billy, Sheriff Jackson, and Deputy Odom's selective enforcement of the law and abuse of process shows that their motivation was to retaliate and that all the allegations were merely pretextual.

407.    Indeed, McClung and her allies shared and received copies of the September 19 subpoena, but none of them faced criminal charges because DA Billy, Sheriff Jackson, and Deputy Odom were not actually motivated by a duty or desire to enforce the grand-jury-secrecy laws.

408.    McClung's allies on the School Board communicated with one another in non-open meetings to discuss the state audit, to coordinate their plans to renew McClung's contract, and to use their offices to punish Plaintiffs.  But DA Billy, Sheriff Jackson, and Deputy Odom did not seize the phones of McClung's allies because they were motivated by retaliatory animus—not a duty or desire to enforce open-meetings laws.

409.    McClung (and DA Billy himself) also revealed the existence of subpoenas and *actual* grand-jury investigations as she bragged throughout the district about her advanced knowledge that DA Billy and Sheriff Jackson planned to arrest her political rivals.  But Defendants did not investigate or prosecute McClung because they were

motivated solely by an intent to retaliate against Sherry, Cindy, and Don.

410.    No other similarly situated people in Escambia County have been arrested, had their phones seized and searched, nor been impeached for receiving, sharing, discussing, or sharing the existence of a subpoena like the one DA Billy issued on September 19, 2023.

411.    Nor has any school board member in Escambia County, or even Alabama more broadly, ever been impeached for voicing their opposition to a superintendent.

412.    As the Alabama School Board Association affirmed, Sherry's impeachment was a corrupt attempt to influence personnel decisions.

413.    Plaintiffs' protected speech (*e.g.*, publicly discussing the school audit and McClung's performance, privately discussing the vote on McClung's contract, publicly opposing McClung, publishing a news article about the school board and a criminal investigation, and *not* publishing enough positive stories about the district) was not a legitimate consideration for their arrest, the seizure of their phones, or Sherry's impeachment.

414.    To make matters worse, DA Billy, Sheriff Jackson, and Deputy Odom were not acting under any time constraints and were not forced to make any split-second decisions when they violated Plaintiffs' constitutional rights.

415.    On the contrary, DA Billy, Sheriff Jackson, and Deputy Odom had ample time to research the law, seek legal advice, and consider the consequences of their actions before they knowingly and willfully decided to violate Plaintiffs' civil rights.

416.    DA Billy, Sheriff Jackson, and Deputy Odom's unconstitutional acts would

chill the protected speech of a person of ordinary firmness, and they did chill Sherry's, Cindy's, and Don's speech.

417.   Indeed, DA Billy, Sheriff Jackson, and Deputy Odom's unconstitutional acts caused at least one other person to forgo running for school board to contest Board member Coleman Wallace's seat in the 2024 election cycle.

418.   Plaintiffs suffered and are still suffering fear, distress, anxiety, and chill on their speech because DA Billy, Sheriff Jackson, and Deputy Odom's conduct showed that Plaintiffs' liberty is at the mercy of vindictive local officials who do not want people challenging their preferred policies or politicians.

419.   Plaintiffs still fear further retribution from DA Billy, Sheriff Jackson, and Deputy Odom.

420.   As a result, Sherry, Cindy, and Don have suffered a violation of their First Amendment rights as a direct and proximate result of DA Billy's, Sheriff Jackson's, and Deputy Odom's retaliatory conduct.

**COUNT II**
**Retaliation in Violation of the First Amendment**
**(Sherry, Cindy & Don against Sheriff Jackson in his official capacity)**

421.   Plaintiffs reallege and incorporate the allegations in ¶¶ 25–380 of this complaint as if they are fully restated here.

422.   Sheriff Heath Jackson is the final policymaker for the Escambia County Sheriff's Office.

423.   Sheriff Jackson is the chief law-enforcement officer in Escambia County and the final policymaker for the County's law-enforcement department.[1]  Sheriff Jackson's actions on behalf of the Escambia County Sheriff's Office represent an official governmental policy, practice, or custom.

424.   Sheriff Jackson enforces the law in Escambia County on behalf of Escambia County.  The County pays his salary "out of the county treasury as the salaries of other county employees are paid."  Similarly, the County pays for the sheriff's offices, equipment, supplies, and all expenses incident to his enforcement of law throughout the County.  On information and belief, any award against the Sheriff's Office would be paid out of the County's fisc.  Moreover, the County's insurance company—rather than the State of Alabama—is funding the defense of the Sheriff's Defendants because the Sheriff's Office is not a state office.

425.   Through Sheriff Jackson's actions, the Escambia County Sheriff's Office adopted and enforced an official policy, practice, or custom of retaliation against Plaintiffs for their protected speech and viewpoints, including their political opposition to School Superintendent Michele McClung and their publication on matters of public concern.

---

[1] Plaintiffs recognize that current precedent wrongly forecloses the availability of *Monell* liability against county sheriffs in Alabama.  Sheriff Jackson is the final policymaker for the County's Sheriff's Office.  He is elected on a county-wide basis to lead the County's law enforcement department, which is funded by the County, as is the Sheriff Defendants' defense in this lawsuit.  The decisions that foreclose municipal liability against county-wide municipal officers in Alabama are wrongly decided, and Plaintiffs have a good-faith basis to bring this claim and preserve a challenge to those decisions.

426.   Sheriff Jackson made a deliberate choice to enact and enforce an official governmental policy of retaliation that resulted in Plaintiffs' arrests, the search and seizure of their cell phones, and Sherry's impeachment.

427.   Sheriff Jackson's express goal, which he implemented as the Escambia County Sheriff's Office's official policy, was to arrest Plaintiffs in retaliation for their speech to punish them and chill their future speech.

428.   Sheriff Jackson, as the final policymaker for the Escambia County Sheriff's Office, was authorized to make rules and regulations he deemed necessary for the County's law enforcement.  In every instance, Sheriff Jackson's decisions and actions represent the official policy of the Escambia County Sheriff's Office.  As final policymaker, Sheriff Jackson made a deliberate choice to procure and execute facially invalid warrants and to arrest Plaintiffs in retaliation for their protected speech.  He also chose to create special rules for how quickly the Sheriff's Office publicizes arrests when those people being arrested are targets of the Sheriff's Office's retaliatory policies.

429.   As final policymaker, Sheriff Jackson authorized and directed the County's law enforcement to retaliate against Plaintiffs in violation of the First Amendment by orchestrating a scheme to arrest Plaintiffs on manufactured charges.

430.   This scheme was part of an official policy, practice, or custom that was deliberate, ongoing, and pervasive—unlike on-the-spot decisions to arrest someone in which someone's speech is a legitimate consideration for their arrest.

431.   The retaliatory policies of Escambia County's Sheriff's Office are part of a persistent and widespread practice of retaliating against political dissidents.

432.   The ongoing and pervasive nature of these policies is exhibited by the six total arrests of Plaintiffs over a four-month span, as well as the previous attempts to use the threat of force to silence political speech critical of McClung.

433.   Plaintiffs' speech (*e.g.*, their private and public discussions about the school audit, their private and public discussions of the investigation into supplemental payments with COVID-relief funds, their private and public discussions of McClung's performance, and their opposition to McClung's retention) was not a legitimate basis for a search warrant, their arrest, impeachment, or for the municipal Defendants' policy of retaliation.

434.   As a direct and proximate result of the Escambia County Sheriff's Office's retaliatory policy, Plaintiffs have suffered and continue to suffer an injury to their First Amendment rights.

## COUNT III
## Violation of the Fourth Amendment
### (Plaintiffs against all Defendants in their individual capacities)

435.   Defendants violated Plaintiffs' clearly established Fourth Amendment rights in at least three ways: (1) the warrantless search and seizure of Ashley's cell phone; (2) the search and seizure of Sherry's and Cindy's cell phones based on facially invalid warrants; and (3) Plaintiffs' arrests without probable cause.

436.   At all times relevant to this complaint, it was clearly established that the Fourth Amendment requires that, absent an exigency, police must obtain a warrant based on probable cause that particularly describes the warrant's scope before they search a person or their property.

437.   Specifically, it was clearly established that, absent an exigency, (1) police

must obtain a warrant based on probable cause to seize and search someone's cell phone; (2) a search-and-seizure warrant must be supported by probable cause and particularly describe the scope of the search; and (3) a person's arrest must be supported by probable cause.

438.    It was also clearly established that, when dealing with modern internet-accessible devices, a warrant must be limited in scope to the particular files or types of files for which there is probable cause to believe they contain evidence of the alleged crime.

439.    It was also clearly established that officers who seek a warrant are liable when a well-trained officer would have known that the supporting affidavit failed to establish probable cause and that the officer should not have applied for the warrant.

440.    Further, it was clearly established that officers cannot rely on materially misleading statements in a warrant application.

*Seizure of Ashley's Cell Phone*
*(Ashley against DA Billy, Sheriff Jackson, Deputy Odom & Deputy Durden)*

441.    Ashley realleges and incorporates the allegations in ¶¶ 86–122 and ¶¶ 197–217 of this complaint as if they are fully restated here.

442.    There was no probable cause to seize and search Ashley's cell phone, and no exigency to excuse the warrantless search and seizure.

443.    Nevertheless, DA Billy and Sheriff Jackson planned to have Sheriff Jackson's deputies seize Ashley's cell phone without probable cause or exigency.

444.    Deputies Odom and Durden agreed to carry out the warrantless seizure of Ashley's cell phone.

445.    Any reasonable officer would have known that the seizure was unlawful.

446.    A warrantless seizure of a cell phone is generally *per se* unconstitutional absent an exigency.

447.    Because the officers here had no basis to believe that Ashley was going to delete anything from her phone or would fail to preserve its contents if asked, the seizure of her phone was *per se* unconstitutional.

448.    In addition to Deputies Odom's and Durden's failure to obtain a warrant, their seizure of Ashley's phone was unsupported by probable cause.

449.    It was not illegal for Ashley to share the September 19 subpoena.  The subpoena was not a grand-jury secret, and Ashley was not a grand-jury witness or otherwise sworn to secrecy.  Even if Ashley had shared the September 19 subpoena with someone other than her fellow custodian—which she did not—it would not have been probable cause to believe she committed a crime.

450.    Moreover, DA Billy, Sheriff Jackson, Deputy Odom, and Deputy Durden had no evidence supporting the allegation that Ashley shared the September 19 subpoena with anyone, let alone anyone in the media.  Indeed, Ashley only shared the subpoena with Rochelle Richardson, who the subpoena also named as a records custodian.

451.    Yet, rather than obtain a warrant (something officers could not do because they lacked probable cause), Deputies Odom and Durden told Ashley she had no choice but to give them her phone and password so that they could search her phone without a warrant.  They then downloaded the entire contents of her phone.

452.    DA Billy, Sheriff Jackson, Deputy Odom, and Deputy Durden knew or should have known that their warrantless search and seizure of Ashley's phone violated clearly

established Fourth Amendment law.

*The Seizure of Sherry's & Cindy's Phones*
*(Sherry & Cindy against DA Billy, Sheriff Jackson, Deputy Odom & Deputy Lowry)*

453.    Sherry and Cindy reallege and incorporate the allegations in ¶¶ 65–103 and ¶¶ 123–202 of this complaint as if fully restated here.

454.    The search and seizure of Sherry's and Cindy's phones violated the Fourth Amendment because no "arguable" probable cause existed to justify the warrant, something any reasonable officer would have known.

455.    DA Billy and Sheriff Jackson ordered the seizure of Sherry's and Cindy's phones.

456.    Deputies Odom and Lowry agreed to carry out the seizure of Sherry's and Cindy's phones.

457.    Any objectively reasonable officer would have known that the open-meetings violation alleged was both factually and legally insufficient to justify a warrant.

458.    Deputy Odom's probable-cause affidavit did not come close to establishing probable cause to believe there was evidence of a crime on Sherry's or Cindy's phones.

459.    Any well-trained officer would have known that Deputy Odom did not have a legitimate basis to apply for the warrants.

460.    The only reason Deputy Odom was able to procure the warrants was by knowingly or recklessly including statements that materially misled the magistrate to believe that there was evidence that Sherry and Cindy spoke about McClung during their phone calls or did so in violation of the Open Meetings Act.

461.    The fact that Sherry and Cindy had private, one-on-one conversations about

McClung could not arguably establish that they violated the Open Meetings Act because that law does not apply to the conversations of two people. Two School Board members do not establish the quorum necessary to trigger the Open Meetings Act.

462.    Moreover, the Open Meetings Act is not even a criminal law. It's a civil law enforced through civil complaints filed either private citizens or the Alabama Attorney General.

463.    Nor was the scope of the search limited to evidence that Sherry and Cindy communicated with each other in violation of the Open Meetings Act. Instead, Sheriff Jackson's office downloaded the entire contents of their phones without limiting the scope to evidence of the particular crimes alleged.

464.    Any objectively reasonable officer would have known that an inapplicable civil statute was a sufficient basis for the warrants to seize Cindy's and Sherry's phones and search their entire contents.

465.    Any objectively reasonable officer would have known that a search of a cell phone—a device that includes personal, intimate details of the suspect's life—must be particularly limited.

466.    Nor was there arguable probable cause to believe that Cindy's phone contained evidence that she violated the grand-jury secrecy law.

467.    As detailed throughout the complaint, sharing the September 19 subpoena was not illegal. The September 19 subpoena was not issued by a grand jury, and even if it had been a grand-jury document, Cindy was not bound by the grand-jury secrecy requirements because she was not a grand juror, grand-jury witness, or grand-jury

stenographer.

468.   The warrant for Cindy's phone was also invalid because, to the extent Deputy Odom's probable-cause affidavit included any evidentiary support, he provided only general rumors without identifying a source, let alone any first-hand knowledge or investigative support for those rumors.  Because Deputy Odom had no basis for these claims, he could not support his allegations through oath or affirmation as required by the clear text of the Fourth Amendment.

469.   The warrant for Cindy's phone also failed to limit its scope (*e.g.*, the type of files or the timeframe in which the files were created or shared) to evidence that Cindy shared grand-jury secrets.

470.   Any reasonable officer would have known that the search warrants were facially invalid and could not withstand Fourth Amendment scrutiny.

*Plaintiffs' Arrests*
*(All Plaintiffs against DA Billy, Sheriff Jackson, Deputy Odom & Deputy Rabren)*

471.   Plaintiffs reallege and incorporate paragraphs ¶¶ 86–163 and ¶¶ 218–380 of this complaint as if fully restated here.

472.   Plaintiffs' arrests violated the Fourth Amendment because no "arguable" probable cause existed to justify their seizure.

473.   DA Billy and Sheriff Jackson ordered Plaintiffs' arrests in reliance on evidence that they compiled through DA Billy's subpoenas, grand-jury investigation, and the searches that relied on the evidence from DA Billy's investigation.

474.   Deputies Odom and Rabren agreed to carry out at least Sherry's and Cindy's arrests.

66

475.   Any objectively reasonable officer would have known that there was no basis to seek a warrant or indictment for Plaintiffs' arrests and that the only way to procure a charging document was through materially misleading statements.

476.   Deputy Odom drafted criminal complaints that obviously failed to meet the probable-cause threshold, and they were able to obtain arrest warrants only because they materially misled the magistrate.

477.   Similarly, DA Billy was able to obtain indictments only because he knowingly or recklessly misled the grand jury on the material facts necessary to satisfy the elements of the crimes charges.

478.   As detailed throughout the complaint, the grand-jury-secrecy law did not apply to Plaintiffs' conduct.

479.   The September 19 subpoena was not issued by a grand jury, was not grand-jury evidence, and was not confidential.  And even if it had been, Plaintiffs were not bound by the grand-jury-secrecy law because they were not grand jurors, witnesses, or stenographers.

480.   Nor was there probable cause for Sherry's other arrests.

481.   As the State of Alabama had already confirmed a year before Sherry's arrest, the ethics laws did not prohibit the Board from purchasing advertisements in *Atmore News* while Sherry was on the Board.

482.   There was no evidence that Sherry asserted any undue influence over the transactions, that she was improperly involved in negotiations, or that the Board paid above market rate for the advertisements.

483.    Moreover, the conduct alleged in the indictment (*i.e.*, the prior administration's purchasing of advertisements from *Atmore News*) necessarily occurred well outside the four-year statute of limitations, as 2016 was last time Sherry was on the Board when the prior administration purchased advertisements from *Atmore News*.

484.    Sherry's third arrest—based on whatever supposed technicality that DA Billy and Sheriff Jackson claimed—lacked any legitimate basis in law.

\*    \*    \*

485.    Plaintiffs suffered violations of their Fourth Amendment rights as a result of DA Billy, Sheriff Jackson, Deputy Odom, Deputy Lowry, and Deputy Rabren arresting them and seizing their property when Defendants knew or should have known that there was no probable cause or other legitimate basis to do so.

## Count IV
## Violation of the Fourth Amendment
### (Plaintiffs against Sheriff Jackson in his official capacities)

486.    Plaintiffs reallege and incorporate the allegations in ¶¶ 65–380 of this complaint as if they are fully restated here.

487.    Sheriff Heath Jackson is the final policymaker for the Escambia County Sheriff's Office.

488.    Sheriff Jackson, as the Escambia County Sheriff, was authorized to make rules and regulations he deemed necessary for the Escambia County Sheriff's Office.  In every instance, Sheriff Jackson's decisions and actions represent the official policy of the Escambia County Sheriff's Office.  As a policymaker with final authority, Sheriff Jackson made a deliberate choice to procure and execute facially invalid warrants, seize Ashley's

phone without a warrant, and arrest Plaintiffs to retaliate against them for their protected speech.

489.    Sheriff Jackson enforces the law in Escambia County on behalf of Escambia County.  The County pays his salary "out of the county treasury as the salaries of other county employees are paid."  Similarly, the County pays for the sheriff's offices, equipment, supplies, and all expenses incident to his enforcement of law throughout the County.  On information and belief, any award against the Sheriff's Office would be paid out of the County's fisc.  Moreover, the County's insurance company—rather than the State of Alabama—is funding the defense of the Sheriff's Defendants because the Sheriff's Office is not a state office.

490.    Sheriff Jackson is the County's chief law-enforcement officer and the final policymaker for the County's Sheriff's Office.[2]  His actions on behalf of the Sheriff's Office represent official governmental policies, practices, or customs.

491.    Through Sheriff Jackson's actions, the Escambia County Sheriff's Office adopted and enforced an official policy, practice, or custom that caused the violation of Plaintiffs' Fourth Amendment rights by authorizing the arrest of Plaintiffs and seizure of their phones without probable cause or any limitation on scope.

492.    Sheriff Jackson made a deliberate choice to enact and enforce an official

---

[2] Plaintiffs recognize that current precedent wrongly forecloses the availability of *Monell* liability against county sheriffs in Alabama.  Sheriff Jackson is the final policymaker for the County's Sheriff's Office.  He is elected on a county-wide basis to lead the County's law enforcement department, which is funded by the County, as is the Sheriff Defendants' defense in this lawsuit.  The decisions that foreclose municipal liability against county-wide municipal officers in Alabama are wrongly decided, and Plaintiffs have a good-faith basis to bring this claim and preserve a challenge to those decisions.

governmental policy that resulted in the unreasonable arrest of Plaintiffs and the unconstitutional search and seizure of their cell phones.

493.    Sheriff Jackson's express goal, which he implemented as the official policy of the County's Sheriff's Office, was to arrest Plaintiffs and seize their cell phones without any legitimate basis.

494.    These unconstitutional seizures were part of an official policy, practice, or custom that was deliberate, ongoing, and pervasive—unlike on-the-spot decisions to arrest someone in which someone's speech is a legitimate consideration for their arrest.

495.    The constitutional issues with these suspicion-less seizures were compounded by the failure to abide by the Fourth Amendment's particularity requirement, and the Sheriff's Office's willingness to download all the data from Plaintiffs' phone without regard for the probable cause, time frame, or the alleged crimes on which the Sheriff's Office purportedly based the searches.

496.    The unconstitutional policies of the Escambia County's Sheriff's Office are part of a persistent and widespread practice of seizing and searching persons and property without probable cause.

497.    The ongoing and pervasive nature of these policies is exhibited by the six total arrests of Plaintiffs over a four-month span and the seizure of Plaintiffs' phones both with and without a warrant.

498.    As a direct and proximate result of the unconstitutional policies that the Escambia County Sheriff's Office adopted and enforced, Plaintiffs suffered a violation of their Fourth Amendment rights.

### COUNT V
### Civil-Rights Conspiracy
### (Plaintiffs against all Defendants in their individual capacities)

499.    Plaintiffs reallege and incorporate the allegations in ¶¶ 20–380 of this complaint as if they are fully restated here.

500.    Defendants conspired with each other and unnamed co-conspirators to violate Plaintiffs' First and Fourth Amendment rights.

501.    District Attorney Billy and Sheriff Jackson both announced publicly and privately that they planned to punish anyone who criticized McClung or stood in the way of her contract renewal.

502.    They both attended and made public statements at a local GOP meeting and at the October 12 Board meeting.

503.    Specifically, DA Billy complained about Sherry's and Cindy's opposition to McClung and warned that he would use the grand jury to punish anyone who opposed McClung, and Sheriff Jackson promised to unleash his "wrath" and to do so on a Friday afternoon so that McClung's detractors would have to "eat his hotdogs" all weekend.

504.    Sheriff Jackson also complained about the "word on the street" coming from certain Board members.

505.    They made their plan well known throughout the community such that it would have been impossible for members of Sheriff Jackson's small staff to remain unaware.

506.    Indeed, even a deputy working at the jail recognized, and told Sherry explicitly, that the Sheriff Jackson's deputies "all kn[e]w" her arrest was politically

motivated.

507.    DA Billy and Sheriff Jackson both had an independent personal stake in the conspiracy to retaliate against McClung's detractors—namely, the furtherance of their individual relationships with McClung.  It was those personal stakes rather than any legitimate lawful purpose that motivated their plans to violate Plaintiffs' constitutional rights.

508.    DA Billy and Sheriff Jackson shared a mutual understanding about the purpose and motivation behind their plans, and they both met with McClung and other Board members to discuss and further their conspiracy to violate Plaintiffs' constitutional rights.

509.    DA Billy and Sheriff Jackson met with and recruited Sheriff Jackson's deputies into their conspiracy.

510.    With full knowledge of the retaliatory basis of the scheme—much of which DA Billy and Sheriff Jackson publicized throughout their small community—the other Defendants agreed to participate in the scheme.  And indeed, they took concerted actions to further the conspiracy.

511.    Specifically, DA Billy subpoenaed Sherry's phone records for the purpose of obtaining a search warrant without probable cause.  DA Billy then shared Sherry's phone records with Sheriff Jackson and Deputy Odom, the latter of whom used the records to swear out a misleading warrant application lacking in probable cause.

512.    In concert with Sheriff Jackson and McClung, DA Billy drafted the September 19 subpoena as a trap to create pretextual grounds to arrest Plaintiffs.

513.    Sheriff Jackson personally assured McClung that their plan would not target any of the staff she hired from Mobile.

514.    Sheriff Jackson then personally served the September 19 subpoena on DA Billy's behalf.  Because Sheriff Jackson was acting toward the conspiracy's goal rather than a lawful purpose, he acted out of character and pretended he did not know who Ashley was when he served the subpoena.

515.    As a result of the conspirators' meetings, McClung had advanced knowledge of the conspiracy's existence and goals, and she shared that knowledge with personnel in the school district.   The conspirators' discussions are how McClung had advanced knowledge of the September 19 subpoena's contents and knew when Sheriff Jackson served the subpoena.  These discussions are also how McClung knew of the plans to arrest Plaintiffs before they happened.

516.    After the Board decided not to extend McClung's contract, the other individual Defendants agreed to carry out DA Billy's and Sheriff's Jackson's conspiracy with the knowledge that the publicly announced plan unconstitutionally targeted Plaintiffs based on their protected speech, that there was no legitimate basis to arrest Plaintiffs or seize their property, and that doing so would violate their constitutional rights.

517.    Deputy Odom carried out serval concerted acts instrumental to the conspiracy's goals.  He swore out the search-warrant applications and criminal complaints when he knew or should have known that they lacked probable cause and that he was furthering a conspiratorial purpose.

518.    The pretextual bases for these warrants and criminal complaints were

planned by DA Billy, Sheriff Jackson, and Deputy Odom with the help of other unnamed co-conspirators, including but not limited to McClung.

519.    Deputy Odom also seized Sherry's phone when he knew or should have known that he lacked arguable probable cause to do so and that the purpose of the seizure was to further a conspiratorial purpose.

520.    Deputy Odom lured Cindy to the police station under false pretenses at which point Deputy Lowry agreed to serve the search warrant for Cindy's phone when the warrant was facially invalid and he knew or should have known that he lacked arguable probable cause to seize Cindy's phone and that he was furthering a conspiratorial purpose.

521.    Deputies Odom and Durden interrogated Ashley and then seized Ashley's cell phone without a warrant or any lawful exception to the warrant requirement.  They knew or should have known at the time that they were furthering a conspiratorial purpose.

522.    The conspirators then planned Plaintiffs' arrests, a main goal of their conspiracy.  Again, there was pre-discussion and a meeting of the minds, as evidenced by the fact that McClung revealed that she had advanced knowledge of the plans to arrest Plaintiffs—just as she had advanced knowledge of the plan to serve the September 19 subpoena.

523.    Deputies Odom and Durden then followed Ashley and her husband around Atmore to make sure the conspirators could arrest Ashley before she left on her pre-planned vacation.

524.    Deputy Rabren arrested Don and Sherry based on a facially invalid warrant that he knew or should have known lacked arguable probable cause.  He also should have

known that he was furthering a conspiratorial purpose.

525.   DA Billy then worked with McClung and at least one other Board member on an investigation to impeach Sherry.   One explicit basis for her impeachment was Sherry's political opposition to McClung.

526.   And finally, DA Billy and Sheriff Jackson had Sherry arrested a third time and booked into jail once again—this time for no real reason.

527.   The individual Defendants all engaged in a series of unlawful acts over four months to carry out the conspiracy, including the unlawful seizure of Cindy's and Sherry's phones; the unlawful seizure of Ashley's phone; the arrest of Ashley, Don, and Sherry; the second arrest of Sherry; the arrest of Cindy; and the third arrest of Sherry.

528.   Defendants' acts in furtherance of the conspiracy resulted in the violation of Sherry's, Cindy's, and Don's First Amendment rights because they were arrested, jailed, had their phones seized, and (in Sherry's case) impeached—all in retaliation for their protected speech.

529.   Defendants' acts in furtherance of the conspiracy also resulted in the violation of Plaintiffs' Fourth Amendment rights because it resulted in their unreasonable arrests and the unreasonable search and seizure of their phones.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court provide the following relief:

530.   Declare that DA Billy's, Sheriff Jackson's, and Deputy Odom's malicious, abusive, and retaliatory arrest of Sherry, Cindy, and Don, the seizure of Sherry and Cindy's phones, and the impeachment of Sherry violated the First Amendment.

531.    Declare that the Escambia County Sheriff's Office's official policies, practices, or custom of retaliating against political dissidents, as applied to Sherry, Cindy, and Don, violated the First Amendment.

532.    Declare that the individual Defendants violated Plaintiffs' Fourth Amendment rights in the following ways:

    a.    DA Billy, Sheriff Jackson, and Deputy Odom knowingly, intentionally, or recklessly procured and executed an invalid warrant to seize Sherry's cell phone unsupported by arguable probable cause, unlimited in scope, and unsupported by an oath or affirmation;

    b.    DA Billy, Sheriff Jackson, Deputy Odom, and Deputy Lowry knowingly, intentionally, or recklessly procured and executed an invalid warrant to seize Cindy's cell phone unsupported by arguable probable cause, unlimited in scope, and unsupported by an oath or affirmation;

    c.    DA Billy, Sheriff Jackson, Deputy Odom, and Deputy Durden knowingly, intentionally, or recklessly seized and searched Ashley's phone without a warrant, exigency, or probable cause;

    d.    DA Billy, Sheriff Jackson, Deputy Odom knowingly, intentionally, or recklessly arrested and detained Plaintiffs without arguable probable cause or any legitimate basis to believe that they'd committed any crimes; and

    e.    Deputy Rabren knowingly, intentionally, or recklessly arrested and detained Don and Sherry without arguable probable cause or any legitimate basis to believe that they'd committed any crimes.

533.    Declare that the Escambia County Sheriff's Office's official policies, practices, or customs of seizing persons and property without probable cause, as applied to Plaintiffs, violated the Fourth Amendment.

534.    Declare that the individual Defendants engaged in a civil conspiracy to violate—and did violate—Plaintiffs' constitutional rights.

535.    Award Plaintiffs compensatory and punitive damages in an amount in excess of $75,000 to be proven at trial, as well as nominal damages.

536.    Award Plaintiffs attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988 as well as any other costs and fees that are legal and equitable.

537.    Award any further legal or equitable relief the Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a jury on all triable issues.

Dated: March 13, 2025.                Respectfully submitted,

_/s/ Jared McClain_
Jared McClain (DC Bar No. 1720062)*
Brian Morris (OH Bar No. 0093530)*
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203
(703) 682-9320
jmcclain@ij.org
bmorris@ij.org
*Admitted _Pro Hac Vice_

_Counsel for Plaintiffs_

## CERTIFICATE OF SERVICE

I certify that on March 13, 2025, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will provide electronic service upon all attorneys of record.

<u>/s/ Jared McClain</u>
Jared McClain (DC Bar No. 1720062)*

*Admitted *Pro Hac Vice*