# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ALABAMA
### MOBILE DIVISION

SHERRY DIGMON, *et al.*,

     *Plaintiffs,*

v.

STEPHEN BILLY, District Attorney, in his
individual capacity, *et al.*,

     *Defendants.*

Civil Case No. 1:24-cv-00425-TFM-B

## <u>PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT STEPHEN BILLY'S MOTION TO DISMISS</u>

**INTRODUCTION**

As the district attorney in Escambia County, Defendant Stephen Billy conspired with the County Sheriff and several Sheriff's deputies to carry out a convoluted plan to retaliate against their ally's political rivals, a journalist, and an innocent bystander. To accomplish the conspiracy's goal, DA Billy spearheaded an investigation to gather enough evidence to convince a grand jury to indict on pretextual charges. DA Billy subpoenaed documents, interviewed witnesses, and collected affidavits. His co-conspirators relied exclusively on that evidence to arrest Plaintiffs and seize their phones on the baseless legal theories that DA Billy cooked up. He now seeks to avoid accountability for his misconduct by asserting that he's absolutely immune for everything he did wrong. But a prosecutor doesn't get immunity simply because he's a prosecutor. Absolute immunity does not shield a prosecutor's investigative acts, and nearly everything DA Billy did to injure the Plaintiffs was through his role as an investigator before he initiated the judicial phase of the case. Accordingly, DA Billy is not protected by absolute immunity for the bulk of his unconstitutional acts. His motion should be denied.

**BACKGROUND**

Back in the summer of 2023, a routine personnel dispute within the Escambia County School Board turned into a political hatchet job. It started because DA Billy and Sheriff Heath Jackson both took an unusual interest in School Superintendent Michele McClung. And when it looked like her job might be in jeopardy, they conspired to use their offices to punish all of McClung's perceived enemies.

The four Plaintiffs in this case were all victims of Defendants' retaliatory conspiracy. Sherry Digmon owns a local newspaper, *Atmore News*, and serves on the School Board alongside Cindy Jackson. They both voted against renewing McClung's contract. Don Fletcher is a journalist at *Atmore News* who reported on the drama in the school district. And Plaintiff Ashley Fore is the school district's payroll supervisor who got caught up in DA Billy's plans to get Sherry, Cindy, and Don. After the School Board agreed not to extend

McClung's contract, the DA Billy's co-conspirators seized Cindy's, Sherry's, and Ashley's cell phones without probable cause and locked all four Plaintiffs in jail.

## A.    Michele McClung's Tenure as School Superintendent

In 2021, the Escambia County School Board hired McClung as superintendent on a contract that ran through the end of the 2023–24 school year.  Am. Compl. ¶ 21.[1]  She quickly developed close personal relationships with DA Billy, Sheriff Heath Jackson, and three of the seven School Board members.  ¶ 24.  At the same time, she ostracized many people within the school district who were hired during prior administrations.  ¶ 23.

Things came to a head in July 2023 when a routine state audit revealed some negative findings about the school district under McClung's watch.  Even though the findings were only preliminary and, in the scheme of things, not that big of a deal, McClung's allies in the County—led by DA Billy and Sheriff Jackson—quickly mounted an offensive to protect McClung.  ¶¶ 24–26.

The first move was to try to extend McClung's contract immediately.  McClung's three allies on the Board called a surprise vote to extend her contract at the first meeting after the preliminary audit results.  ¶¶ 37–64.  The vote failed 4-3, with Sherry and Cindy both voting no.  ¶ 56.  But Board President Danny Benjamin promised to force a second vote on McClung's contract in the coming weeks.  ¶ 58.

## B.    DA Billy & Sheriff Jackson Conspire to Protect McClung's Job

In the meantime, DA Billy and Sheriff Jackson met privately with McClung to hatch a plan.  ¶ 31.  As part of this effort, DA Billy and Sheriff Jackson both took the unusual step of involving themselves in the state audit.  ¶¶ 88, 122–26.  They also began a public and private pressure campaign to rally support for McClung and threaten anyone who stood in her way.  ¶¶ 71–75.  As part of that effort, they attended a local GOP meeting on September 18, 2023, and announced their plans to retaliate against anyone who opposed

---

[1] Going forward, all ¶ cites refer to the Amended Complaint.

McClung.    ¶ 71.    Sheriff Jackson told the meeting that he would arrest McClung's detractors on a Friday so that they couldn't bail out until Monday and would have to "eat his hotdogs all weekend."    ¶ 75.

Cindy's husband, Charles, reached out to DA Billy to clear the air after the meeting. But DA Billy told Charles there was "nothing left to say" and accused Cindy of spreading "vicious lies" about McClung and warned that whatever happens he's "going to do [his] job."    ¶¶ 80–82.    As Billy's actions would establish over the next month, by "doing his job," Billy meant that he would investigate and prosecute anyone who opposed McClung.

**C.    DA Billy Put His Retaliatory Scheme Into Action**

The day after the GOP meeting, September 19, 2023, DA Billy issued a subpoena to the Escambia County School Board.    The subpoena instructed the Board's record custodians, Plaintiff Ashley Fore and Rochelle Richardson, to send Billy certain financial records from before McClung's tenure.    ¶¶ 87, 91, 95, 100.    This subpoena was not issued through a grand jury, but rather under a state statutory provision that gives district attorneys the power to issue subpoenas when no grand jury is in session.    ¶¶ 92–97. Importantly, the subpoena itself established that DA Billy was conducting an investigation. It specified that the records he requested "were related to 'an investigation/prosecution into a criminal matter[.]'"    ¶ 103.

Although DA Billy used his investigatory powers to issue the subpoena, the subpoena served two ulterior purposes.    First, it created the impression that the prior administration—and not McClung—was responsible for the negative audit results.    ¶ 102. And second, the subpoena was bait.    Even though the document did not come from a grand jury and was not confidential, DA Billy soon warned that his investigations were "secret" and that sharing anything about the investigation—including the September 19 subpoena—was illegal.    ¶¶ 129, 141–42, 144.    This fake crime of sharing his subpoena would form the pretense for Plaintiffs' arrests just over a month later.

DA Billy developed this plan alongside Sheriff Jackson and McClung.  ¶¶ 31, 122, 350–53, 508–09.  Sheriff Jackson personally served DA Billy's September 19 subpoena on Ashley.  ¶ 98.  And later that same night, McClung made a surprise, nighttime visit to Ashley's office and revealed that she had received a "tip" (from DA Billy and Sheriff Jackson) that Ashley was receiving a subpoena that day.  ¶¶ 109–10, 122.  McClung asked to see the subpoena and remarked that it wasn't worded quite the way should have been, letting Ashley know that she had advanced notice.  ¶¶ 113–14.  The next day, McClung assured a colleague that she knew from DA Billy and Sheriff Jackson that the subpoenas were coming and that they planned to target only people in the district from the prior administration.  ¶ 122.

Ashley shared the subpoena with her boss, Rochelle Richardson, whom the subpoena also named.  ¶¶ 115–17.  Richardson then shared a copy with Cindy, who shared a copy with other Board members, including Sherry, who then shared a copy with *Atmore News* reporter, Don.  ¶¶ 117–21.  No one saw any issue with sharing the subpoena because it was not confidential and nothing on the document suggested otherwise.  ¶ 120.

## D.    DA Billy Threatens the Board

Two days after subpoenaing the Board, DA Billy sent the Board members a threatening letter.  ¶¶ 123–32.  His letter expressed concern with "statements which are being made in the community" about the recent audit.  ¶¶ 123–24.  He assured the Board that he had not presented anything about the audit to the grand jury but issued a warning about what he had planned.  DA Billy told the Board members, "I do have complete control of the Grand Jury in Escambia County, Alabama," and added that he might, at some point bring *other* matters before a grand jury but was "not at liberty to discuss" his investigation. ¶ 127.  This letter revealed a few things: the September 19 subpoena was not part of a grand-jury investigation; DA Billy was already conducting an investigation but had not yet convened a grand jury; and he was planning to use the grand jury to go after Board members.

Billy also began rallying support for McClung from other leaders in the community to help urge the Board to retain McClung. He and Sheriff Jackson routinely singled out Sherry and Cindy for their criticism and thinly veiled threats, even though two other Board members also voted against McClung. ¶¶ 67–69, 82–83, 143, 160. Their focus on Cindy and Sherry led McClung's other allies to focus their vitriol specifically on the two women on the Board. ¶¶ 84–85, 147, 155, 161–63.

### E. DA Billy Reiterates His Threats in Person

On October 12, 2023, the Board met for another vote on McClung's contract. ¶ 133. DA Billy and Sheriff Jackson both attended. ¶ 134. Before the vote, DA Billy stood up to reiterate the threats he made in his letter a few weeks prior. ¶ 135. Even he acknowledged that it was unusual for the district attorney to involve himself in an "employment situation" in the school district. ¶ 136. And it *was* unusual—he had never showed up to a Board meeting before to speak on behalf of any other employee. ¶ 137.

According to Billy, the reason he was acting unusually was because some Board members were saying things in the community about McClung, making "vicious personal attacks." ¶ 138. He told the room that he was so "disturb[ed] . . . that public officials would be out telling something that is just not so" that he had been investigating those responsible (Cindy and Sherry) and collecting "statements and affidavits" from witnesses. ¶ 143. Again Billy warned that he "control[s] the grand jury of this County," and he promised that, although he would not bring McClung's misconduct before a grand jury, "there's other matters that *will* be brought before a grand jury." ¶¶ 140–41. Signaling his plans to invoke grand-jury-secrecy laws, DA Billy warned that *all* his investigations "are secret by law, that's a secret investigation." ¶ 142.

DA Billy then went further. He told the Board that voting against McClung's contract extension was illegal and warned, "So, my recommendation as district attorney and my history of working with this woman is to renew her contract." ¶¶ 145–46.

But the Board did not give in to Billy's threats.  They voted again to reject McClung's contract extension, again by a 4-3 vote.  ¶ 151.  As people left the meeting, Sheriff Jackson told Cindy they were "on different sides" and that she'd never be elected again.  ¶ 160.

**F.    DA Billy & Sheriff Jackson Make Good on Their Threats**

A week after the second vote against McClung, on October 20, 2023, DA Billy and Sheriff Jackson had a deputy obtain search warrants for Cindy's and Sherry's phones for the crime of talking to one another.  ¶¶ 165–75.  DA Billy's theory was that it violated the Open Meetings Act for Sherry and Cindy to talk outside of public meetings because they were both elected officials.  ¶¶ 170–74.  Then, sometime between September 28 and October 20, Billy subpoenaed Sherry's phone records to see how frequently she and Cindy called one another.  ¶¶ 170–71.  The phone records showed 40 phone calls between the women, which was enough of a pretextual basis to get warrants.  ¶¶ 170–86.  And the application for Cindy's phone listed a second suspected crime: revealing grand-jury secrets.  ¶¶ 182–85.  The problem, of course, is that Cindy had not been a grand juror or witness and did not have or share any grand-jury secrets.  ¶¶ 334–38.  Rather, the warrant referred to the September 19 subpoena that Billy kept claiming, falsely, was secret.  ¶¶ 335–37.

Given the complete lack of evidence of criminal wrongdoing, the warrants should have never issued.  The conspirators had no evidence that Sherry and Cindy's phone calls were even about Board business. The warrant application simply declared that "it is believed that Digman [*sic*] and Jackson held private conversations regarding the vote and outcome of the Superintendent vote."  ¶ 173.  Moreover, the Open Meetings Act does not apply to private conversations, and the two women talking could not satisfy the law's quorum requirement.  ¶¶ 175–79.  And, of course, there were no grand-jury secrets.

Five days after Sheriff Jackson's deputies executed the search warrants for Cindy's and Sherry's phones, Sherry and Don took the bait that DA Billy set out with his September 19 subpoena of the Board.  Sherry decided to publish an article in *Atmore News*,

written by Don, that discussed the October 12 Board meeting, DA Billy's unusual remarks at that meeting, and the existence of the September 19 subpoena.  ¶¶ 197–202.

Publishing the article set off the next phase of the conspiracy.  Sheriff Jackson's deputies seized Ashley's phone without a warrant the next day to establish that she shared the subpoena (she didn't).  ¶¶ 203–17.  And the day after that—a Friday, just as Sheriff Jackson had promised—Sheriff's deputies arrested Ashley, Sherry, and Don for the supposed crime of sharing DA Billy's bogus September 19 subpoena—even though the document was not confidential and none of them were bound to secrecy.  ¶¶ 218–92.  Fortunately, with a little luck, quick thinking, and court staff working late, they managed to avoid eating Sheriff Jackson's hot dogs all weekend.  ¶¶ 285–92.

## G.    The Prosecutorial Phase of the Retaliation

After the first set of arrests, the conspirators had Sherry arrested a second time on November 1, 2023.  It turned out that, true to his word, DA Billy had convened a grand jury to investigate Sherry on ethics charges.  ¶ 294.  He used the grand jury to subpoena records from the Board and interviewed at least one Board member as a witness.  ¶¶ 295, 353.  And again, he did it all with McClung's knowledge and support.  ¶ 122.  This time, however, DA Billy eventually presented evidence to the grand jury to secure Sherry's indictment on bogus ethics charges.  ¶ 296.  As with the first arrest, the charges for Sherry's second arrest were also pretextual and lacked even arguable probable cause.  ¶¶ 293–307.  One deputy at the jail told Sherry that they all knew her arrest "was political."  ¶ 311.

DA Billy didn't stop there.  He also used his grand jury to impeach Sherry over her opposition to McClung.  ¶¶ 313–39.  He then had Cindy indicted on similarly bogus charges for sharing his September 19 non-secret subpoena.  ¶¶ 330–43.  And he had Sherry and Don indicted, too, even though they'd already been criminally charged.  The superseding indictment prevented them from having the preliminary hearing they had scheduled for the next day to challenge the lack of probable cause supporting their criminal complaints.

¶¶ 344–49.  Again, McClung bragged to personnel in the district that she had advanced knowledge of DA Billy and Sheriff Jackson's plan to arrest her political rivals.  ¶¶ 350–53.

### H.    The Plan Blows Up

The blatantly retaliatory arrests caused such outrage that the Board placed McClung on paid leave and had her leave her role early.  ¶ 356.  With the object of his efforts gone, DA Billy finally gave up the charade.  He dismissed the impeachment case against Sherry and recused himself from all the criminal cases because, as he told the court, he had "'both a legal and a personal conflict' and that justice would best be served by his recusal." (A conflict, of course, that had existed all along.)  ¶¶ 369–70.  The Alabama Attorney General's Office took over the remaining cases and dismissed every case *with prejudice* within just 17 days.  ¶ 373.

Plaintiffs then brought three claims against DA Billy and his co-conspirators in the Sheriff's Office.  *First*, DA Billy retaliated against Sherry, Cindy, and Don for protected speech in violation of their clearly established First Amendment rights.  ¶¶ 381–420. *Second*, he violated their clearly established Fourth Amendment rights by arresting them and seizing Sherry's, Cindy's, and Ashley's phones.  ¶¶ 435–85.  *Third*, DA Billy conspired with others, including Sheriff Jackson and his deputies, to use state power to silence and punish them for their protected speech, including by using a sham investigation and retaliatory arrests against them.  ¶¶ 499–529.  In response, DA Billy moved to dismiss all three claims against him.  *See* DA Billy Mot. to Dismiss ("MTD"), ECF 29.

### DISCUSSION

DA Billy moved to dismiss the amended complaint on the sole grounds that he is entitled to absolute prosecutorial immunity.[2]  His motion relies on the notion that every

---

[2] Importantly, DA Billy does not contend that his conduct would be entitled to qualified immunity if he is not shielded by absolute immunity.  *See generally* MTD.  Nor does he suggest that Plaintiffs failed to satisfy the elements for First Amendment retaliation, unreasonable searches and seizures under the Fourth Amendment, or civil conspiracy.  *See id.*  As a result, his motion rises and falls on the issue of absolute immunity

action he took in violation of Plaintiffs' constitutional rights was prosecutorial in nature simply because he was employed as a prosecutor and planned to eventually bring charges. MTD at 25–26.

But as Plaintiffs will explain, there is a presumption *against* absolute immunity that DA Billy cannot overcome. The Supreme Court has adopted a functional approach under which Billy must establish that his alleged conduct was "intimately associated with the *judicial* stage of the criminal process" (*i.e.*, as an advocate prosecuting charges in court) rather than associated with the *investigative* stage of the process (*i.e.*, looking into allegations and collecting evidence to establish probable cause). *See Burns v. Reed*, 500 U.S. 478, 486–87 (1991) (emphasis added). A prosecutor receives absolute immunity only for his prosecutorial acts—not his investigative acts.

Rather than satisfy his burden of showing his acts were prosecutorial, DA Billy offers a theory of absolute immunity so broad that it would swallow the investigative-prosecutorial distinction altogether. According to Billy's theory, a prosecutor is functioning as an advocate whenever he collects and evaluates evidence while thinking about bringing a case. MTD 14, 18. Such a rule would replace the Supreme Court's functional approach to absolute immunity with one that absolves prosecutors for all their misdeeds so long as they eventually bring charges. The Supreme Court has already rejected that exact argument. *See Buckley v. Fitzsimmons*, 509 U.S. 269, 272–73 (1993).

Under the Supreme Court's rule, everything DA Billy did to plan and carry out the investigative phase of Defendants' retaliatory scheme—from his pre-grand-jury conduct to his use of the grand jury as an investigative body—was investigative. He does not receive absolute immunity for these acts. That leaves only DA Billy's work of securing grand-jury indictments and his participation in the criminal proceedings. These traditional

---

alone. *See, e.g.*, *Callaway v. Bell*, No. 6:05-CV-1569, 2006 WL 1232826, at *4 n.5 (M.D. Fla. May 8, 2006) ("Because the parties do not address the defense of qualified immunity, the Court does not consider it at this stage.").

prosecutorial acts are shielded by absolute immunity. But DA Billy's investigative acts are all Plaintiffs need to support their three claims.

## A.    Absolute Prosecutorial Immunity Does Not Cover Investigative Acts

Although the text of Section 1983 does not expressly provide for any governmental immunity, the Supreme Court has interpreted it to incorporate the common-law immunities available to public officials at the time of its enactment.[3] *See Burns*, 500 U.S. at 486–87. Generally, prosecutors are entitled to only qualified immunity. In limited circumstances, however, they may receive absolute immunity—but only for their functions as an advocate for the State in a criminal proceeding. *Id.* Because modern prosecutors perform a wide range of functions, many of which are not advocative, the mere fact that a defendant is a prosecutor does not entitle them to absolute immunity. Rather, the analysis turns on the *function* being performed, not their identity. *Id.* at 486.

To determine whether a prosecutor is absolutely immune, courts conduct a fact-bound inquiry into the nature of the alleged conduct. *See Kassa v. Fulton County*, 40 F.4th 1289, 1294 (11th Cir. 2022). Absolute immunity applies only to actions within the scope of the prosecutor's role as an advocate—*i.e.*, actions that are "intimately associated with the *judicial* stage of the criminal process." *See Buckley*, 509 U.S. at 270 (emphasis added) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)). For example, prosecutorial functions include "initiating a prosecution and presenting the State's case." *Hart v. Hodges*, 587 F.3d 1288, 1295 (11th Cir. 2009) (per curiam). It's also a prosecutorial function to evaluate evidence that police have collected and prepare its presentation in court "*after* a

---

[3] For that reason, many judges have expressed their "skeptic[ism] as to whether, in 1871, common-law practice recognized absolute prosecutorial immunity." *Price v. Montgomery County*, 72 F.4th 711, 727 n.2 (6th Cir. 2023) (Nalbandian, J., concurring in part and in the judgment). Rather, "history suggests that 'prosecutorial action would have enjoyed only qualified immunity.'" *Id.* (quoting *Burns*, 500 U.S. at 497 (Scalia, J., concurring in the judgment and dissenting in part) and collecting cases). While that history warrants the Supreme Court's consideration, it also supports a narrow application of the doctrine here.

decision to seek an indictment has been made." *Buckley*, 509 U.S. at 273 (emphasis added). These actions are all traditionally associated with prosecutors—advocating for the state in court and trying to obtain criminal convictions.

By contrast, actions outside of a prosecutor's function as an advocate—*i.e.*, "investigative acts" that are not "intimately associated with the judicial stage of the criminal process"—are *not* entitled to absolute immunity. *See Buckley*, 509 U.S. at 270, 275–76. Such non-advocative acts include advising the police, talking to the press, and swearing out probable-cause affidavits. *Terry v. Russell Cnty. Bd. of Educ.*, No. 3:14-cv-00953, 2015 WL 13736622, at *11–12 (M.D. Ala. Sept. 28, 2015), *R&R adopted as supplemented*, 2015 WL 8481888 (M.D. Ala. Dec. 9, 2015); *see also Holden v. Sticher*, 427 F. App'x 749, 751 (11th Cir. 2011) (per curiam) ("giving legal advice to police where a prosecutor guides police rather than where a prosecutor prepares his or her own case").

Unsurprisingly, the investigative-acts exception also covers investigating. *See Buckley*, 509 U.S. at 274. This is the work a prosecutor does before he seeks an indictment to initiate the criminal phase of the process—looking into allegations, interviewing witnesses, subpoenaing documents, and trying to build a case. Investigative acts include a prosecutor's search for "clues and corroboration that might give him probable cause to recommend that a suspect be arrested," *Rivera v. Leal*, 359 F.3d 1350, 1353 (11th Cir. 2004) (quoting *Buckley*, 509 U.S. at 273); *Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1280 (11th Cir. 2002) (prosecutor's participation in a search). Until there's probable cause to arrest someone, a prosecutor cannot function as an advocate for the state trying to obtain a criminal conviction. *See Buckley*, 509 U.S at 274. So, at this investigative stage, he enjoys the same qualified immunity as the police do for their investigations. *Id.* at 273.

DA Billy tries to avoid this rule by artificially narrowing the scope of the investigative exception to only the type of things police "normally perform[]."[4] MTD at

---

[4] DA Billy also focuses extensively on the idea that his motives before the grand jury are irrelevant to the absolute-immunity analysis. MTD at 14–19. Plaintiffs agree. We do

25–27.  In DA Billy's telling, a prosecutor loses absolute immunity only if his investigation *looks* like the work of a police officer.  *See* MTD at 14, 18.

But this argument runs headlong into Supreme Court precedent.  In *Buckley,* the Court held that a prosecutor's use of a grand jury to subpoena expert witnesses—something not typically considered a "police function" (and even further along in the process than most of DA Billy's conduct here)—was *still* investigative and thus unprotected by absolute immunity.[5]  *See* 509 U.S. at 275.  The message from *Buckley* is that absolute immunity does not extend to a prosecutor's efforts to establish probable cause.  *See id.*

The cases DA Billy cites do not say differently—nor could they.  The main case he relies on (MTD at 25–26), *Rowe v. City of Fort Lauderdale*, 279 F.3d 1271 (11th Cir. 2002), follows *Buckley*.  In *Rowe*, a prosecutor participated in the search of the plaintiff's apartment.  279 F.3d at 1277–78.  The Eleventh Circuit said that the prosecutor was *not* entitled to absolute immunity because it was the type of "investigative function" normally performed by a detective or police officer.  *Id.* at 1280.  Nowhere, however, did the Court say that police-type actions are the outer bounds of the investigative-acts exception.  *See id.* at 1280–81.  The question in *Rowe* was simply whether "a prosecutor step[ped] out of the role of advocate and into the role of investigator."  *Id.* at 1280.  And just because the

---

not address the many allegations regarding DA Billy's motives in showing that his acts were not prosecutorial functions.  Those allegations are, however, still relevant for the underlying substantive claims, including whether he retaliated against Plaintiffs for their protected speech.  *See Captain Jack's Crab Shack, Inc. v. Cooke*, No. 21-11112, 2022 WL 4375364, at \*7 (11th Cir. Sept. 22, 2022) (per curiam) (recognizing that allegations regarding a prosecutor's motives may be relevant for the underlying substantive claim, even though they are not relevant for determining whether absolute immunity applies.).  As such, because DA Billy does not contest Plaintiffs' substantive claims, his improper motives (and his discussion of his motives) are irrelevant to his motion to dismiss.

  DA Billy quotes from a pre-*Buckley* case, *Mullinax v. McElhenney*, 817 F.2d 711 (11th Cir. 1987), for the proposition that "a prosecutor is entitled to absolute immunity for the factual investigation necessary to prepare a case, including interviewing witnesses before presenting them to the grand jury."  MTD at 14.  But *Buckley* repudiated that position, *see* 509 U.S. at 275, so that quote from *Mullinax* is no longer good law.

prosecutor in *Rowe* did something like a police officer (which is easily "investigative") does not mean that *only* those types of police actions are investigative.

The same is true for *Ward v. Chafin*, which is just another case in which a prosecutor lacked absolute immunity for actions normally performed by the police. No. 22-12993, 2023 WL 2661527, at *2–4 (11th Cir. Mar. 28, 2023) (per curiam). But again, just like *Rowe*, the Eleventh Circuit did not cabin "investigative" conduct to just traditional police work. *See id.*; *cf. Rivera*, 359 F.3d at 1353 (prosecutor assigned to a defendant's case was not acting as an investigator when he pulled a copy of the defendant's driver's license to validate his mistaken-identity defense).

DA Billy is simply wrong that these cases somehow limit "investigative conduct" to police work—especially when *Buckley* applied the exception to a prosecutor's grand-jury investigation. *See* 509 U.S. at 274. Investigative acts are not limited to the exact methods of gathering evidence used by police. Under *Buckley*, almost all DA Billy's conduct in this case—his efforts to investigate Plaintiffs and gather enough evidence to build a sham case—occurred before he was prosecuting a criminal case for the state. Absolute immunity does not shield those acts.

**B.    DA Billy's Retaliatory Conduct Far Exceeded His Role as an Advocate**

DA Billy's retaliatory conduct falls within three broad categories, two of which are investigative and outside the scope of absolute immunity. *First*, his actions before he ever convened a grand jury are purely investigative. *Second*, the steps he took to build his case and establish "probable cause" through and alongside his use of the grand jury are also investigative. And *third*, his limited actions after he presented his evidence to return indictments are actually prosecutorial. This section will address the categories in turn and explain why nearly all DA Billy's conduct was investigative and, as such, not shielded by absolute immunity.

### 1.    Pre-Grand-Jury Actions

The bulk of DA Billy's conduct in this case occurred before he convened a grand jury. We know that because he told everyone for months before he sought indictments that he was conducting an investigation and planned to *eventually* convene a grand jury. As a result, this conduct is far outside the scope of a prosecutor's function as an advocate in a criminal proceeding.

### a.    DA Billy's pre-grand-jury conduct was investigative

DA Billy began meeting with Sheriff Jackson and McClung to plan the retaliatory conspiracy toward the end of the summer in 2023, well before there was a grand jury. ¶¶ 122, 303, 352, 508. DA Billy and Sheriff Jackson both intervened in the state audit sometime that July or August. ¶¶ 31, 68, 72–74, 81, 122–26, 139. McClung met routinely with DA Billy during this time, and she always knew what Billy and Sheriff Jackson were planning next—including that their investigation would not target any of McClung's people in the distrcit. ¶¶ 33, 122, 303, 352.

Then, on September 19, DA Billy drafted and Sheriff Jackson served the first subpoena, which DA Billy only had the power to do *because* there was no grand jury in session. ¶¶ 87–103. He followed that subpoena with several more, including some to investigate Sherry on ethics charges and one to Sherry's phone provider. ¶¶ 122, 165–66.

Although DA Billy led the sham investigation, he worked in tandem with the Sheriff's Office. DA Billy and Sheriff Jackson attended public meetings together and spread the same threats throughout the County. ¶¶ 31, 81–82, 122–23, 134–46, 501–05. DA Billy helped create the factual basis and legal theories for the conspirators' case. He identified the pretextual bases for warrants and criminal complaints, and he issued subpoenas and interviewed witnesses to help build close enough of a factual predicate. ¶ 143. The September 19 subpoena he issued was the pretextual basis for Plaintiffs' arrests. ¶ 88. And his subpoena of Sherry's phone records was the pretextual basis to seize Cindy's and Sherry's phones. ¶ 398. All this conduct was purely "investigative." *See Rehberg v. Paulk*,

611 F.3d 828, 842 (11th Cir. 2010) (holding that a prosecutor was not entitled to absolute prosecutorial immunity for preparing and filing subpoenas).  There was no investigation independent of the one that DA Billy helped conduct.

It was public knowledge that DA Billy was leading an investigation because he announced repeatedly that he was leading an investigation.  He told people in private, in writing, and at public meetings.  ¶¶ 30–32, 80–85, 122–46, 254–56, 351.  His September 19 subpoena said it was part of an investigation.  ¶ 103.  His letter to the Board warned that he was looking into other matters that he was "not at liberty to discuss."  ¶ 127.  His comments at the Board meeting on October 12 revealed that he was conducting a "secret investigation," collecting evidence and witness affidavits to build a case against Board members he thought were spreading rumors about McClung.  ¶¶ 142–43.  And he bragged to a friend that he was using the grand jury to investigate Don and Sherry.  ¶¶ 254–55.

The Court simply needs to take DA Billy at his word.  His entire "investigation" into Plaintiffs before he convened a grand jury is *not* protected by absolute immunity.  He does not get to avoid accountability simply because he holds the position of prosecutor and eventually chose to bring charges based on the evidence he collected during his investigation.  *See Buckley*, 509 U.S. at 275.

### b.    DA Billy's attempts to immunize himself for investigative acts are unconvincing

To avoid the straightforward application of *Buckley*, DA Billy offers two arguments for why his investigative acts should still enjoy absolute immunity: (1) his conduct was lawful and/or harmless and (2) Plaintiffs' allegations are conclusory.  *See* MTD at 20–23. Neither argument gets him anywhere.

*First*, whether DA Billy used his lawful authority to conduct a retaliatory investigation does not change the fact that he conducted a retaliatory investigation in violation of Plaintiffs' constitutional rights.  Prosecutors are often using their lawful

investigative authority when courts deny them absolute immunity. *See, e.g.*, *Buckley*, 509 U.S. at 275; *Rowe*, 279 F.3d at 1277–78.

*Second*, Plaintiffs' allegations are not conclusory. Far from it. The Amended Complaint includes dozens of detailed allegations that put DA Billy at the center of this unconstitutional scheme and show him taking concerted acts necessary to its success. ¶¶ 24, 31–32, 66, 71, 80–82, 86–103, 122–32, 134–46, 164–69, 199–202, 226–41, 252–61, 294–95, 303–07, 313–30, 332–38, 344–53, 366–67, 369–73. Of course, Plaintiffs also included legal conclusions to "provide the framework of [their] complaint." *See Iqbal v. Ashcroft*, 556 U.S. 662, 679 (2009). DA Billy does not explain why (or how) he would magically get absolute immunity just because Plaintiffs included legal conclusions alongside their specific factual allegations. Nor does he argue that the hundreds of remaining allegations would fail to satisfy the elements of Plaintiffs' three claims.

To be sure, DA Billy cites some cases that found allegations related to prosecutors as conclusory. *See* MTD at 23. But those cases all involved bare-bones allegations that a prosecutor "directed" or "instructed" the police conduct at issue. *See id.* at 23–24 (citing *Ward v. Chafin*, No. 22-12993, 2023 WL 2661527 (11th Cir. Mar. 28, 2023) (per curiam) (unpublished); *Captain Jack's Crab Shack, Inc. v. Cooke*, No. 21-11112, 2022 WL 4375364 (11th Cir. Sept. 22, 2022) (per curiam) (unpublished); *Hoffman v. Off. of State Att'y, Fourth Jud. Cir.*, 793 F. App'x 945 (11th Cir. 2019); *Mathis v. Eslinger*, No. 20-13761, 2022 WL 16849124 (11th Cir. Nov. 10, 2022) (per curiam) (unpublished); *Rone v. Rich*, No. 1:22-cv-00509, 2023 WL 8592980 (S.D. Ala. Aug. 9, 2023)). With nothing more than that legal conclusion, the plaintiffs in these cases could not transform the prosecutors into investigators that lost absolute immunity.

Take *Captain Jack's Crab Shack*, for example. There, the Eleventh Circuit found the allegations conclusory because the plaintiff lacked specific allegations about the prosecutor giving legal advice or participating in the investigation. 2022 WL 4375364, at *7. The Court distinguished a Sixth Circuit case in which the plaintiffs "described—in detail—a

series of calls and meetings" in which the prosecutor advised the police, as well as "the prosecutors' substantial investigative role in that case," such as directing officers to get more involved and padlock the plaintiff's business. *Id.* (citing *Rieves v. Town of Smyrna*, 959 F.3d 678 (6th Cir. 2020)).

Plaintiffs' allegations are exactly like the detailed ones that the Eleventh Circuit said plaintiffs need. Indeed, the Amended Complaint is replete with detailed allegations about DA Billy's direct role in the investigation, his meetings with Sheriff Jackson and McClung, and their cooperative efforts from making public threats to issuing subpoenas to interviewing witnesses to make good on those threats. *Cf. Keating v. City of Miami*, 598 F.3d 753, 763–65 (11th Cir. 2010) (allegations that police chief commanded staff to respond to protesters unconstitutionally were sufficient at the pleadings stage to establish the police chief was a proximate cause of the unconstitutional acts). DA Billy's subpoenas were the factual basis for the warrants and arrests, and the Sheriff's Office relied on DA Billy's legal theory—which he wrote down in a letter and publicized at the October 12 Board meeting. *See Rieves*, 959 F.3d at 693 (advising police on a legal theory and the existence of probable cause is not protected by prosecutorial immunity (citing *Burns*, 500 U.S. at 493)). Further, Plaintiffs' allegations that DA Billy was coordinating with Sheriff Jackson this entire time (¶ 122) are backed up by the lawmen's co-appearances and joint conduct from the start of the planning through the final arrest. *See Gibbons v. McBride*, 124 F. Supp. 3d 1342, 1380 (S.D. Ga. 2015) (holding that the chronology of events and commonality of actors created the necessary inference).

Put simply, DA Billy planned, announced, initiated, and worked with his co-conspirators to carry out the investigative phase of the conspiracy to punish McClung's political opponents. The investigative acts he engaged in before he convened a grand jury are *not* protected by absolute immunity.

17

## 2.    Pre-Indictment Acts Before the Grand Jury

The second bucket of allegations involves DA Billy's use of a grand jury to further his investigation.  The Supreme Court has held that a prosecutor's use of a grand jury to investigate falls outside the scope of absolute immunity.  *See Buckley*, 509 U.S. at 275.  In so holding, the Court distinguished between initiating a grand jury to present evidence and return an indictment (which is protected) and using the grand jury to gather additional evidence to establish probable cause (which is not protected).  *Id.*  This distinction holds even if a prosecutor eventually uses the grand jury to seek an indictment.  *Id.*  In other words, an eventual grand jury indictment does not sweep under the umbrella of absolute immunity a prosecutor's prior efforts to obtain evidence through the grand jury.  *Id.*  Those actions remain investigatory acts regardless of the outcome.

That's exactly what happened here.  At some point between September 28 and October 27, 2023, DA Billy convened a grand jury to investigate Plaintiffs.  As part of that grand-jury investigation, he subpoenaed documents and interviewed witnesses.  ¶¶ 295, 315.  He investigated ethics charges against Sherry and grounds for her impeachment, again using the grand jury's investigative powers to issue subpoenas and interview witnesses.  ¶ 295; *see Rehberg v. Paulk*, 611 F.3d 828, 842 (11th Cir. 2010) (no absolute prosecutorial immunity for preparing and filing subpoenas); *Wooten v. Roach*, 964 F.3d 395, 409 (5th Cir. 2020) (no absolute immunity for using a grand jury to subpoena documents and interview witnesses).  DA Billy's use of the grand jury to gather evidence against Plaintiffs is not protected by absolute immunity.  *See Buckley*, 509 U.S. at 275.

DA Billy tries to elide his investigatory use of the grand jury by insisting that "appearing before and utilizing a grand jury" is prosecutorial in nature.  MTD at 26; *id.* at 19 (asserting immunity for "his conduct in connection with the Escambia County grand jury").  But his position disregards direct precedent to the contrary and the historical function of grand juries as civil investigative bodies.

Start with the precedent. In *Buckley*, the Court held that a prosecutor's use of a grand jury to subpoena witnesses was investigative. 509 U.S. at 275. The Court said that the grand jury's "immediate purpose was to conduct a more thorough investigation of the crime—not to return an indictment against a suspect whom there was already probable cause to arrest." *Id.* at 275. As the Supreme Court explained, a prosecutor's eventual decision to present the evidence he's collected "does not retroactively transform" the prosecutor's investigative work into a prosecutorial function. *Id.* at 275–76. A contrary rule would allow a prosecutor to "shield himself from liability for any constitutional wrong against innocent citizens by ensuring that they go to trial." *See id.*; *see also Rivera*, 359 F.3d at 1353 ("A prosecutor functions as an investigator when he 'search[es] for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested.'" (quoting *Buckley*, 509 U.S. at 273)). Instead, a prosecutor's use of a grand jury (instead of relying solely on the police) to gather evidence does not change the function of the investigative act. *See Burns*, 500 U.S. at 486 (focusing on function).

The Supreme Court's rule in *Buckley* follows the grand juries' historical function as civil investigative bodies that function *before* a criminal proceeding can begin. *Post v. United States*, 161 U.S. 583, 587 (1896); *In re Misc. 4281*, 149 A.3d 1253, 1261–65 (Md. App. Ct. 2016) (detailing the history and tradition of grand juries and explaining that there can be no criminal proceeding until the grand jury returns an indictment). A grand jury "is a grand inquest, a body with powers of investigation and inquisition." *Blair v. United States*, 250 U.S. 273, 282 (1919). Its inquest is non-adversarial; "it is an ex parte *investigation* to determine whether a crime is committed and whether criminal proceedings should be instituted." *United States v. Calandra*, 414 U.S. 338, 343–44 (1974) (emphasis added). The grand jury's collection of evidence is not "part of the criminal proceedings against the accused, but [] merely to assist the grand jury in determining whether such proceedings shall be commenced." *Post*, 161 U.S. at 587.

Given this historical context, it makes sense that the use of a "civil investigatory body" to determine whether a crime has been committed is not "intimately associated with the judicial stage of the criminal process." *See Buckley*, 509 U.S. at 271. Instead, a grand-jury investigation is just that—an investigation. When a prosecutor uses the grand jury to subpoena documents and interview witnesses to build a case, his investigation is not protected by absolute immunity. *See Buckley*, 509 U.S. at 275; *Wooten*, 964 F.3d at 409.

Although the Eleventh Circuit has not addressed "investigative acts" before grand juries post-*Buckley*, other circuits have underscored that investigative conduct through grand juries is not protected by absolute immunity. *See, e.g.*, *Kent v. Cardone*, 404 F. App'x 540, 543 (2d Cir. 2011) ("A prosecutor is absolutely immune with respect to *non-investigatory* conduct before a grand jury." (emphasis added)); *Pownall v. Krasner*, No. 23-2049, 2024 WL 4164621, at *5 (3d Cir. Sept. 12, 2024) ("[P]rosecutorial grand jury advocacy is broadly immune, but such immunity does not overcome detailed allegations of investigative actions overlapping grand jury proceedings, e.g., seeking out another witness to plug a hole in a case.").[6]

The Fifth Circuit's decision in *Wooten v. Roach* is particularly instructive. 964 F.3d 395, 409 (5th Cir. 2020). Like this case, *Wooten* involved a politically motivated investigation into an elected official (that time, a judge) who was urged on by someone who had lost an election. *Id.* at 399. The Fifth Circuit rejected the prosecutor's argument that his actions before a grand jury were prosecutorial, emphasizing that "alleged misconduct . . . before a grand jury does not automatically supply the intimate connection with the judicial process upon which *Imbler* immunity depends." *Id.* at 409 (citation omitted). Following *Buckley*'s teaching, the Fifth Circuit distinguished between a prosecutor "presenting evidence to a grand jury—either to obtain an indictment or a no

---

[6] The Eleventh Circuit has found opinions by other circuits on prosecutorial immunity persuasive. *See, e.g.*, *Kassa v. Fulton County*, 40 F.4th 1289, 1293–94 (11th Cir. 2022) (agreeing with *Odd v. Malone*, 538 F.3d 202 (3d Cir. 2008)).

bill—from situations where the prosecutor and grand jury play[ ] a broader investigative role than the typical grand jury asked simply to true bill or no bill a specific suspect." *Id.* Consequently, the Fifth Circuit rejected the same argument that DA Billy is making here: "Prosecutors 'may not shield [their] investigative work with the aegis of absolute immunity merely because,' in hindsight, 'that work may be . . . described as "preparation" for a possible trial.'" *Id.* at 409 (quoting *Buckley*, 509 U.S. at 276). Just because "a suspect has been identified as the subject of an investigation," the Fifth Circuit affirmed, does not make the investigatory acts "inherently 'prosecutorial' determinations." *Id.*

These decisions confirm that DA Billy's use of the grand jury to build his case against Plaintiffs—by subpoenaing documents and witnesses—was investigative. His actions were undertaken before there was probable cause and before he presented the evidence he collected to seek an indictment. "A prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested." *Buckley*, 509 U.S. at 274. Accordingly, DA Billy is not entitled to absolute immunity for his grand-jury investigations.

### 3.    Indictments and Post-Indictment Actions

Finally, there are core prosecutorial functions that are entitled to absolute immunity. These functions include initiating a prosecution, presenting the state's case before a court, evaluating the evidence assembled by police, and "appropriate preparation for its presentation at trial or before a grand jury *after* a decision to seek an indictment has been made." *See Buckley*, 509 U.S. at 272–73 (emphasis added).

Plaintiffs concede that, under binding precedent, DA Billy is absolutely immune for his conduct in presenting evidence to secure indictments and his participation in the criminal proceedings that followed. That means DA Billy is absolutely immune for these five acts (and *only* these five acts):

1.  DA Billy secured an indictment of Sherry on ethics charges on October 27, 2023,[7] by misleading the grand jury on the material facts necessary to satisfy the elements of the crimes.

2.  DA Billy filed and then dismissed the bill of impeachment against Sherry on October 27, 2023, and February 22, 2024, respectively.  ¶¶ 316, 329.

3.  DA Billy secured indictments of Cindy, Sherry, and Don on December 1, 2023, on the charge of revealing grand-jury secrets by misleading the grand jury on material facts necessary to satisfy the element of the crime.  ¶¶ 330, 344, 477.

4.  DA Billy reduced Sherry's bond to precipitate her third arrest on February 12, 2024.  ¶¶ 361–68.

5.  DA Billy recused himself from all the criminal cases on February 21, 2024, based on the conflicts of interest that motivated him to bring the charges in the first place.  ¶¶ 369–70.

Importantly, however, Plaintiffs do not need these allegations for their claims to survive because DA Billy violated their rights well before he ever sought the indictments. *Cf. Coggins v. Buonora*, 776 F.3d 108, 113 (2d Cir. 2015) (explaining that, when some conduct is absolutely immune, the court should consider whether the claim requires that conduct).  Ashley, Sherry, and Cindy all had their phones seized without probable cause between October 23 and October 26—*well before* DA Billy sought indictments in his grand-jury secrets case related to those seizures.  ¶¶ 187–88, 191, 203–08.  The same goes for the arrests of Ashley, Sherry, and Don on October 27 for revealing grand-jury secrets. ¶¶ 218, 251–65.  DA Billy did not present his evidence to the grand jury about Plaintiffs supposedly revealing grand-jury secrets until December 1—over a month after his

---

[7] Although the Amended Complaint lists the date of Sherry's second arrest (the first on by indictment) as November 1, 2023, DA Billy presented his case for the ethics charges on October 27.

investigation and legal advice led to Plaintiffs' arrest ¶¶ 330, 334. The fact that DA Billy later acted as prosecutor does not retroactively render him immune for the constitutional violations he had already committed prior to that point. *See Buckley*, 509 U.S. at 275–76.

**CONCLUSION**

DA Billy is not protected by absolute prosecutorial immunity for any of the investigative actions alleged in the Amended Complaint. The Court should deny his motion to dismiss.

Dated: May 6, 2025.                                Respectfully submitted,

                                                   */s/ Jared McClain*
                                                   Jared McClain (DC Bar No. 1720062)*
                                                   Brian Morris (OH Bar No. 0093530)*
                                                   INSTITUTE FOR JUSTICE
                                                   901 N. Glebe Road, Suite 900
                                                   Arlington, VA 22203
                                                   (703) 682-9320
                                                   jmcclain@ij.org
                                                   bmorris@ij.org
                                                   * Admitted *Pro Hac Vice*

                                                   *Counsel for Plaintiffs*