## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| SHERRY DIGMON, et al., | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| | ) | **CIVIL ACTION NO.** |
| **v.** | ) | **1:24-cv-00425-TFM-B** |
| | ) | |
| STEPHEN BILLY, et al., | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANT STEPHEN BILLY'S REPLY TO PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AMENDED COMPLAINT

COMES NOW Defendant Stephen Billy ("Billy"), by and through undersigned counsel of record, and submits this Reply to Plaintiff's Opposition to Defendant's Motion to Dismiss Amended Complaint, stating the following:

### I.    INTRODUCTION

Plaintiffs' Response in Opposition (Doc. 39) contains aspirational statements about what Plaintiffs feel the law of absolute immunity for prosecutors should be, but generalizes the extant authority. The well-settled precedent applied to allegations of the Amended Complaint requires dismissal of Plaintiffs' claims against Billy. Even Plaintiffs acknowledge that Defendant Billy has absolute immunity for several acts Plaintiffs filed suit on, including Billy's seeking and securing indictments by a grand jury against the three Plaintiffs indicted as well as the impeachment against Plaintiff Digmon.

However, Plaintiffs wildly conflate and distort the remaining allegations of the Amended Complaint in an attempt to avoid dismissal of all of Plaintiffs' claims against Defendant Billy. A focus on the allegations of the Amended Complaint, Plaintiff-by-Plaintiff, is important as Plaintiffs' Response attempts to blur all lines pertaining thereto. And, as addressed in Section IV.

61050986 v1

herein, Plaintiffs woefully mischaracterize the September 19, 2023 subpoena issued to the Board

for COVID payment records, which records (and the subpoena seeking them) had nothing to do

with Plaintiffs whatsoever.

Perhaps most importantly, this Reply necessarily presents an extensive treatment of

*Buckley v. Fitzsimmons*, 509 U.S. 269 (1993), as Plaintiffs' Response rises and falls with this

decision. It falls, as Plaintiffs do not address its unique facts – facts bearing no resemblance to the

allegations here – and ignore its primary holdings, which confirm prior Supreme Court precedent

extending absolute immunity for prosecutors to acts in preparation for initiating a prosecution, and

limiting any investigatory exception to instances where prosecutors undertake acts normally done

by a detective or police officer.

There are virtually no facts pled in the Amended Complaint showing any pre-grand jury

investigation of Plaintiffs by Billy (as opposed to others). The grand jury was convened here less

than a month prior to the indictment of the first Plaintiff (Digmon). Plaintiffs cite no case holding

that the actions of a prosecutor before such a short-duration grand jury that returns indictments is

actionable (and not subject to absolute immunity), as the imposition of prosecutorial liability in

such instances would undermine the serious public policy considerations supporting such

immunity discussed by the Supreme Court in *Imbler v. Pachtman*, 424 U.S. 409 (1976).

## II.    PLAINTIFF-BY-PLAINTIFF ALLEGATIONS

Just as in Billy's Motion to Dismiss (Doc. 29, pp. 8-9), Plaintiff-by-Plaintiff allegations

are set forth below.

### A.    Plaintiff Ashley Fore

Fore alleges her phone was seized without a warrant by sheriff's deputies (Odom and

Durden), with data therefrom downloaded by the sheriff. (Doc. 25, ¶¶ 203-215). There is no

allegation Billy was involved. Fore alleges she was arrested on a sworn criminal complaint by

Defendant Deputy Odom quoted in Paragraph 225 of the Amended Complaint. (Doc. 25, ¶¶ 222-225). The sole averment as to Billy alleges conclusorily that "[t]he purported basis for Ashley's arrest was entirely fabricated by DA Billy, Sheriff Jackson, and Deputy Odom who swore to the criminal complaint." (Doc. 25, ¶ 239). Fore's jail booking was handled by sheriff's deputies and jail personnel. (Doc. 25, ¶¶ 242-250).

### B.    Plaintiff Cynthia Jackson

It is alleged that Billy was District Attorney when Jackson was indicted by a grand jury on December 1, 2023 for corruptly obtaining information pertaining to a grand jury in violation of ALA.CODE § 12-16-215, with the indictment leading to her December 4, 2023 arrest. (Doc. 25, ¶¶ 330, 332, 339-340). Plaintiff acknowledges that Defendant Billy is immune from liability for seeking and securing the indictment. (Doc. 39, pp. 22-23). Jackson does not allege that Billy was involved in her arrest or booking.

Jackson alleges her phone was seized under a search warrant obtained by Deputy Odom on October 20, 2023. (Doc. 25, ¶¶ 165-186). While Odom is alleged to have applied for and obtained the search warrant from a magistrate for the phone, the Amended Complaint alleges generally that Odom did so "at the instruction of DA Billy and Sheriff Jackson." (Doc. 25, ¶ 165). Aside from this conclusory phrase, there is no allegation that Billy was involved in applying for the warrant or presenting it to a magistrate, in seizing the phone under the warrant, or in downloading data therefrom. Plaintiffs' initial Complaint did not have this conclusory allegation against Billy.

### C.    Plaintiff Sherry Digmon

It is alleged that Billy was the District Attorney on October 27, 2023 when Digmon was indicted by a grand jury on ethics violations (described at Doc. 25, ¶¶296, 304), on December 1, 2023 when she was indicted on charges of revealing grand jury information (Doc. 25, ¶¶ 344-345), and when the grand jury returned a bill of impeachment against her in October 2023. (Doc. 25, ¶

320). Plaintiffs acknowledge that Billy has absolute immunity for seeking and securing the indictments, and for securing and filing the impeachment. (Doc. 39, pp. 22-23).

The Amended Complaint details Digmon's October 27, 2023 arrest by Sheriff's deputies and jail booking following a criminal complaint signed by Defendant Odom, with virtually no allegation of Billy's involvement. (Doc. 25, ¶¶ 265-292). The only mention of Billy is a conclusory allegation that "[j]ust like with Ashley and Don, *DA Billy and Sheriff Jackson had Sherry arrested* for revealing grand-jury secrets by publishing Don's article." (Doc. 25, ¶ 271)(emphasis added). Plaintiffs allege that this arrest followed a criminal complaint signed by Defendant Deputy Odom. (Doc. 25, ¶ 272). The Amended Complaint alleges that Digmon was arrested also on November 1, 2023 on the ethics charges in the October 27, 2023 indictment. (Doc. 25, ¶ 293). There is no allegation aside from the conclusory italicized phrase above that Billy was involved in her arrest or in her booking.

Like Jackson above, Digmon now alleges that although a warrant was applied for by Defendant Odom to seize her phone and the warrant was issued by a magistrate, that Defendant Odom acted "at the instruction of DA Billy and Sheriff Jackson." (Doc. 25, ¶ 165). Aside from this conclusory phrase, there is no underlying factual allegation Billy was involved in applying for the warrant or presenting it to a magistrate, in seizing the phone, or in downloading data therefrom. (Doc. 25, ¶¶ 166-196).

### D.    Don Fletcher

The Amended Complaint does not allege Billy's involvement in Fletcher's arrest by sheriff's deputies on October 27, 2023, pleading vaguely at most that Billy had "spoken of" plans to have Fletcher arrested. (Doc. 25, ¶¶ 254-255). The Amended Complaint alleges that Billy was District Attorney on December 1, 2023 when Plaintiff Fletcher was indicted by the Escambia County grand jury on charges of revealing grand jury information. (Doc. 25, ¶¶ 344-345). Plaintiffs

acknowledge that Billy enjoys absolute immunity for seeking and securing the indictment. (Doc. 39, pp. 22-23).

III.    **CLAIMS PLAINTIFFS CONCEDE IN THEIR RESPONSE**

Plaintiffs' Response concedes that Defendant Billy has absolute immunity for the securing of indictments against Plaintiffs Jackson, Fletcher, and Digmon (two indictments), for the filing and later dismissal of the bill of impeachment against Plaintiff Digmon, for the reduction of Plaintiff Digmon's bond and subsequent "arrest" on February 12, 2024, and for Billy's recusal from the criminal cases. (Doc. 39, pp. 21-122). The concession that Billy is immune from liability in securing the indictments also means that Billy is absolutely immune from liability for the arrests of Plaintiffs Jackson, Digmon, and Fletcher pursuant to those grand jury indictments. Plaintiff Jackson's only arrest, in December of 2023, was pursuant to her indictment by the grand jury.

IV.    **THE SEPTEMBER 19, 2023 SUBPOENA AND PLAINTIFFS' TREATMENT THEREOF**

For the degree of significance Plaintiffs' Response attributes to the subpoena served on the Board on September 19, 2023, Plaintiffs oddly ignore its subject matter entirely. Plaintiffs allege the subpoena is a "trap," "bogus," and "part of a sham investigation," among other things. (Doc. 25, ¶ 88; Doc. 39, p. 8). Plaintiffs allege that "the purpose of the subpoena was to create the impression that the prior administration – and not McClung – was responsible for any indiscretions and investigations surrounding the district's finances." (Doc. 25, ¶ 102). In reality, Plaintiffs avoid the subpoena's subject matter because it doesn't fit within their Response's narrative.

First, the subject matter of the subpoena had *nothing* to do with any of the four Plaintiffs whatsoever. None. The subpoena sought, as alleged in the Amended Complaint, "certified copies of any and all checks written to employees and labeled as 'COVID' payments or 'COVID BONUS' for the years 2020-23." (Doc. 25, ¶ 100). The proper expenditure of COVID funds by a

local governmental body is certainly the proper subject of inquiry. What Plaintiffs themselves (and not the Board) actually did with the subpoena once it was served did become a subject later presented by Billy to the grand jury, which returned indictments of three of the Plaintiffs, for which Plaintiffs acknowledge that Billy enjoys absolute immunity; however, Plaintiffs repeatedly invoke the subpoena as purportedly proving that Billy was investigating Plaintiffs themselves, when it shows nothing of the sort. If Billy was investigating something or someone through the subpoena seeking COVID payment information (with issuance authorized by Ala.Code § 12-17-184), and even if Billy stated at some point (as claimed by Plaintiffs) that there was an investigation of some sort ongoing, the subpoena gives no indication that the subject of any investigation was the Plaintiffs.

Second, the claim in both Plaintiffs' Amended Complaint and in their Response that the subpoena's purpose was to blame the prior administration for financial issues, and not superintendent McClung's administration, is also incorrect. One need look only at the date range for the documents sought by the subpoena: 2020 through 2023. (Doc. 25, ¶ 100). The Amended Complaint alleges that McClung became superintendent for the 2021 school year. (Doc. 25, ¶ 21). Thus, given the 2020 to 2023 time frame of the subpoena, more than half of this time frame was within McClung's tenure as superintendent. The assertions on page 3 of Plaintiffs' Response that "[t]he subpoena instructed the Board's record custodians … to send Billy certain financial records from before McClung's tenure" and that the subpoena "created the impression that the prior administration – and not McClung – was responsible for the negative audit results" are simply wrong, as the 2020 to 2023 time frame for the subpoena captured large parts of McClung's tenure. The theory in Plaintiffs' Response that Billy could somehow use a subpoena for COVID payment

records, which did not concern Plaintiffs in any way, as part of a plan "to use the grand jury to go after Board members" for not supporting McClung, defies logic and common sense.

**V.      PLAINTIFFS' MISREADING OF *BUCKLEY v. FITZSIMMONS* INFECTS THEIR ENTIRE RESPONSE AND A THOROUGH REVIEW THEREOF NEGATES PLAINTIFFS' POSITION**

Rarely does a party's position so depend upon one case, but Plaintiffs' position does here. Thus, the extensive discussion below of *Buckley v. Fitsimmons*, 509 U.S. 269 (1993), is warranted. Plaintiffs cite its version of the purported holding of *Buckley* erroneously and misstate its facts multiple times in its Response in an attempt to inflate or enlarge an "investigatory exception" that both the Supreme Court in *Buckley* and the Eleventh Circuit have, time after time, kept narrow.

Defendant Billy does not dispute that he is not absolutely immune simply by his title as prosecutor. Rather, he acknowledges that his absolute immunity stems from the nature of his acts. Defendant Billy also admits that if he undertakes to investigate at a preliminary stage in the way a police officer or detective does, then like the police officer or detective, he enjoys only qualified immunity and not absolute immunity. This, however, is where Plaintiffs' position parts company with Billy's position, with *Buckley*, *supra*, and with controlling Eleventh Circuit law.

Plaintiffs maintain that Billy's only acts that receive absolute immunity are "DA Billy's work of securing grand-jury indictments and his participation in the criminal proceedings." (Doc. 39 at pp. 10-11). This argument is identical to petitioner's position in *Buckley*, where the position was phrased as "*Imbler*'s protection for a prosecutor's conduct 'in initiating a prosecution and in presenting the State's case' extends 'only to the act of initiation itself and to conduct occurring in the courtroom.'" *Buckley*, 509 U.S. at 272. The Court in *Buckley* strongly rejected this position as inconsistent with *Imbler*:

> This extreme position is plainly foreclosed by our opinion in *Imbler* itself. We expressly stated that "the duties of the prosecutor in his role as advocate for the State involve actions *preliminary to the*

> initiation of a prosecution and actions apart from the courtroom,"
> and are nonetheless entitled to absolute immunity.

*Buckley*, 509 U.S. at 272 (Emphasis added).

Plaintiffs' Response continues in this same vein, arguing that in *Buckley*, "the Court held that a prosecutor's use of a grand jury to subpoena expert witnesses … was still investigative and thus unprotected by absolute immunity." (Doc. 39, p. 12). This fundamentally misreads *Buckley* and its unique facts, which bear no resemblance to the allegations of the Amended Complaint here.

In *Buckley*, the plaintiff sued his former prosecutors alleging they fabricated evidence during the preliminary investigation of a crime – the murder of an 11-year-old in February 1983. The allegedly fabricated evidence was the retention of an expert witness to testify to a link between a bootprint at the murder scene and the *Buckley* plaintiff. The case remained unsolved for more than a year, with no arrests until March of 1984. After three separate studies by other experts were unable to reliably connect the bootprint to a pair of boots plaintiff provided, the prosecutors obtained a "positive identification" from an anthropologist allegedly well known for her willingness to fabricate unreliable expert testimony. *Buckley* at 262. This expert opinion was obtained "during the early stages of the investigation," which was conducted under joint supervision and direction of the sheriff and the prosecutors, with "police officers and assistant prosecutors … performing essentially the same investigatory functions." *Id*. at 262-263.

Thereafter, a special grand jury was convened for the sole purpose of investigating the murder, with the grand jury hearing testimony from more than 100 witnesses over eight months, after which the grand jury was still unable to return an indictment. *Id*. at 264. One prosecutor admitted in a public statement in January 1984 that there was insufficient evidence to indict someone; however, even though no additional evidence was obtained, an indictment was returned by the grand jury in March of 1984, and a prosecutor (now civil defendant) held a press conference

that was alleged to be defamatory, and plaintiff was arrested. *Id*. The trial resulted in a hung jury

and mistrial and, while plaintiff remained in jail, a third-party confessed to the crime, the subject

expert witness passed away, and the charges against plaintiff were dropped. *Id*.

The Court noted that while it had been "quite sparing" in recognizing absolute immunity

for state actors, "some officials perform 'special functions' which, because of their similarity to

functions that would have been immune when Congress enacted § 1983, deserve absolute

protection from damages liability." *Id*. at 268-269. In so doing, the Court reinforced its application

of a "functional approach" looking to "the nature of the function performed, not the identity of the

actor who performed it." *Id*. at 269.

The Court in *Buckley* also noted that public policy considerations discussed in *Imbler v.*

*Pachtman*, 424 U.S. 409, 96 S.Ct. 984 (1976), supported a rule of absolute immunity for conduct

of prosecutors that was "intimately associated with the judicial phase of the criminal process."

*Buckley*, 509 U.S. at 270 (quoting *Imbler*, 424 U.S. at 430). The Court also noted that in *Imbler*, it

"did not attempt to describe a line between a prosecutor's acts in preparing for those functions,

some of which would be immune, and his acts of investigation or 'administration,' which would

not." *Buckley*, 509 U.S. at 270 (quoting *Imbler*, 424 U.S. at 431).

The Court noted that a prosecutor's administrative duties and "investigatory functions that

do not relate to an advocate's preparation for initiation of a prosecution or for judicial proceedings

are not entitled to absolute immunity." *Buckley*, 509 U.S. at 273. However, the Court expressly

rejected the limiting principle proposed in Plaintiffs' Response here:

> We have not retreated, however, from the principle that acts
> undertaken by a prosecutor in preparing for the initiation of judicial
> proceedings or for trial, and which occur in the course of his role as
> an advocate for the State, are entitled to the protections of absolute
> immunity. Those acts must include the professional evaluation of
> evidence assembled by the police and appropriate preparation for its

> presentation at trial and before a grand jury after a decision to seek
> an indictment has been made.

*Buckley*, 509 U.S. at 273 (emphasis added).

Plaintiffs' Response contends that Defendant Billy's position is "artifically narrowing the scope of the investigative exception to only the types of things police [normally perform[]." (Doc. 39, p. 12). However, Billy's position is no "artificial" creation, but it simply recites the Supreme Court's holding in *Buckley*, which reinforced that absolute immunity will not apply when the prosecutor fills "the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested…". *Buckley*, 509 U.S. at 273. Further, again in *Buckley*, the Court held that absolute immunity cannot be justified "[w]hen a prosecutor performs the investigative functions normally performed by a detective or police officer…". *Buckley*, 509 U.S. at 273.

Plaintiffs' Response contends that "*Buckley* applied the exception to a prosecutor's grand-jury investigation." (Doc. 39, p. 14). This clearly misapprehends the facts of *Buckley*, where the Court noted as significant that a special grand jury was empaneled only <u>subsequent to</u> the fabrication of the false evidence concerning the bootprint. *Buckley*, 509 U.S. at 275 ("It was well after the alleged fabrication of false evidence concerning the bootprint that a special grand jury was empaneled"). The Court further expressly noted that once empaneled, the grand jury's immediate purpose was to investigate the crime, not return an indictment. *Buckley*, 509 U.S. at 275. Thus, "the prosecutors' conduct occurred well before they could properly claim to be acting as advocates." *Buckley*, 509 U.S. at 275. In summary, "[w]hen the functions of prosecutors and detectives are the same, as they were here, the immunity that protects them is also the same." *Buckley*, 509 U.S. at 276.

The grand jury was convened by Defendant Billy, according to Plaintiffs' Response (Doc. 39, p. 19), between September 28 and October 27, 2023, when the grand jury returned its first indictments. The duration and work of this grand jury, under the allegations of the Amended Complaint, bears no resemblance whatsoever to the investigative grand jury empaneled in *Buckley* which heard from more than 100 witnesses over eight months without returning an indictment. The difference between the allegations here and the facts of *Buckley* could hardly be greater.

## VI. THE INVESTIGATORY EXCEPTION REMAINS NARROW AND IS INAPPLICABLE TO THE FACTUAL ALLEGATIONS OF THE AMENDED COMPLAINT

Plaintiffs' Response states that "nearly everything DA Billy did to injure the Plaintiffs was through his role as an investigator before he initiated the judicial phase of the case." (Doc. 39, p. 2). While this dramatic switch is understandable given Plaintiffs' concession that Billy enjoys absolute immunity for several acts, it is simply not in accord with the actual allegations of the Amended Complaint, which have scant factual allegations of investigatory conduct by Billy.

First, recall what is investigatory conduct of a prosecutor under the law. Plaintiffs' position on this issue, that all prosecutorial acts even before a grand jury up to the point of an indictment are investigatory, was thoroughly rejected by the Supreme Court in *Buckley*, *supra*, as noted in Section V. The Eleventh Circuit precedent on this is no different, reinforcing the principle that a prosecutor only loses absolute immunity when he/she takes actions normally done by a detective or police officer. See *Rehberg v. Paulk*, 611 F.3d 828, 838 (11th Cir. 2010)(prosecutor not entitled to absolute immunity when he "performs the investigative functions normally performed by a detective or police officer"); *Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1280 (11th Cir. 2002)(prosecutor alleged to have attended search of suspect's apartment and logged in evidence found to have "stepped out of his prosecutorial role to perform 'the investigative functions normally performed by a detective or police officer'").

Because the Amended Complaint lacks specific factual allegations of investigatory conduct by Billy, Plaintiffs' Response resorts to other tactics. Plaintiffs attempt to pull Billy into actions that the Amended Complaint alleges were taken by non-prosecutors (sheriff's deputies) by making only conclusory allegations against Billy (seizure of Digmon/Jackson phones by sheriff deputy via search warrant issued by magistrate after sworn application by deputy allegedly undertaken "at the direction of [Billy]"; Fore's arrest on sworn criminal complaint attested by sheriff's deputy had "purported basis for … arrest entirely fabricated by [Billy]"; etc.). These particular conclusory allegations in the Amended Complaint and discussed at length in Billy's Motion to Dismiss (Doc. 29, pp. 23-24) are just the type of broad sweeping allegations held insufficient to properly allege prosecutorial liability and overcome absolute immunity.

Moreover, had Billy personally involved himself in proceedings seeking a search warrant or arrest warrant, he would have no liability as he would be absolutely immune. *Burns v. Reed,* 500 U.S. 478, 492 ("the issuance of a search warrant is unquestionably a judicial act"). The Eleventh Circuit has frequently noted that a conspiracy allegation cannot be grounded in acts for which a prosecutor is immune. See *Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1282 (11th Cir. 2002)("[i]t would be cold comfort for a prosecutor to know that he is absolutely immune from direct liability for actions taken as a prosecutor, if those same actions could be used to prove him liable on a conspiracy theory involving conduct for which he was not immune"); accord *Rehberg v. Paulk*, 611 F.3d 828, 854 (11th Cir. 2010)("cannot state a valid conspiracy claim by alleging the Defendants conspired to do things they are already immune from doing directly").

Further, statements in Plaintiffs' Response are undermined by the actual cited paragraphs within the Amended Complaint. Plaintiffs' Response asserts that Paragraph 31 of the Amended Complaint alleges that "DA Billy and Sheriff Jackson met privately with McClung to hatch a

plan." (Doc. 39, p. 3). Paragraph 31 does not so allege, simply reading: "McClung also met with DA Billy and Sheriff Jackson about the audit." Plaintiffs' Response asserts, citing Paragraphs 88 and 122-126, that DA Billy and Sheriff Jackson "took the unusual step of involving themselves in the state audit." (Doc. 39, p. 3). Paragraph 88 discusses only the September 19 subpoena to the Board for COVID payment records, not the audit, and the remaining cited paragraphs allege that Billy spoke with one auditor and advised McClung he had done so, and that Billy wrote to the Board members, after certain Board members' rumor-mongering and misstatements about potential indictment of superintendent McClung, to advise that he had personally spoken with the auditors and that based on those discussions, there was nothing to present to a grand jury. (Doc. 25, ¶ 88, 122-126). In addition to the letter Billy wrote to Board members, the Amended Complaint alleges that Billy later made an appearance at a Board meeting on October 12, 2023 to recommend extension of McClung's contract.

As of October 12, 2023, there is virtually nothing alleged to indicate Billy is investigating Plaintiffs. The October 12, 2023 Board meeting appearance is just fifteen (15) days before the first grand jury indictment issued to any Plaintiff (Sherry Digmon). At most, Plaintiff Digmon alleges that Billy subpoenaed her phone records at some point after September 28, but this subpoena to a third-party is not alleged to be a constitutional violation and is not part of Digmon's claims in the Amended Complaint. (See Doc. 25, ¶¶ 385, 435, 532).

Plaintiffs' vigorously mischaracterize the September 19 subpoena to the Board for COVID payment records as somehow showing that Billy was investigating Plaintiffs. Plaintiffs' only argue the unrelated September 19 subpoena *to the Board* in an attempt to somehow claim Billy was investigating *Plaintiffs* for some longer period, when no facts alleged show such investigation. Plaintiffs' Response even asserts at p. 14 that the "September 19 subpoena he issued was the

pretextual basis for Plaintiffs' arrests," ignoring that the subpoena sought COVID payment records from the Board, with nothing to do with Plaintiffs at all.[1]

Plaintiffs' Response asserts that the grand jury subpoenaed Board records and "at least one Board member" as witness, with no particular time frame. Plaintiffs' Response contends that the grand jury was convened for only a short time – sometime after September 28, 2023 – with Plaintiff Digmon indicted on October 27, 2023. (Doc. 39, p. 19). The very short interval between convening a grand jury and indictment contrasts starkly with those very few outlying cases where a prosecutor's conduct before a grand jury has been held to be investigatory.[2] Plaintiffs' desired rule here, stripping absolute immunity from prosecutors even for their actions before the grand jury up until October 26, 2023 (the day before indictment) also clashes irreconcilably with grand jury confidentiality. ALA.CODE § 12-16-216 (1975). Most importantly, were Plaintiffs' position – denying absolute immunity for a prosecutor anytime he/she subpoenaed a witness or documents – the actual law, the absolute immunity protecting prosecutors on the public policy grounds discussed at length in *Imbler*, *supra*, would be rendered worthless.

Lastly, after acknowledging that the 11th Circuit has never held that a prosecutor's acts before a grand jury can be investigatory, Plaintiffs cite authorities from outside the Eleventh

---

[1] Plaintiffs' Response has other misstatements about subpoenas, asserting at p. 14 that the Amended Complaint alleges at Paragraphs 122 and 165-166 that Billy "followed [the September 19] subpoena with *several more*, including some to investigate Sherry on ethics charges and one to Sherry's phone provider." These Paragraphs have allegations only on the September 19 subpoena to the Board, and a subpoena for Digmon's phone records. There is no allegation of "*several more*." Plaintiffs' Response at p. 14 claims that Billy "issued subpoenas and interviewed witnesses," citing Paragraph 143 of the Amended Complaint, but this paragraph merely notes Billy's frustration with public officials' dishonesty and that he has "statements and affidavits" from people of what was said to them. There are no references to subpoenas or interviews.

[2] Defendant Billy agrees that Plaintiffs' examples of a prosecutor's legal advice to police, statements to the media, and signing under oath as a complaining witness on probable cause affidavits, all fall outside of absolute immunity. The Amended Complaint alleges no such conduct by Billy here.

Circuit. These are factually distinguishable, but frequently support Defendant Billy's position on the law.

The Fifth Circuit case of *Wooten v. Roach*, 964 F.3d 395 (5th Cir. 2010) is definitively a factual outlier, with at least six grand juries empaneled over two years relative to a sitting judge, with several grand juries not returning indictments and more than two years passing before the first indictment. The plaintiff in *Wooten* alleges that prosecutor Milner "used the grand juries as investigatory tools – for example, to subpoena documents and individuals. Milner admitted, after over a year of investigating, that he needed more time to gather enough evidence to indict Wooten – i.e., he admitted to not yet having probable cause." *Wooten*, 964 F.3d at 409. However, the Fifth Circuit still recognized that "prosecutors are not entitled to absolute immunity when 'functioning as the equivalent of a detective rather than as an advocate preparing for trial.'" *Wooten*, 964 F.3d at 407. The Sixth Circuit confirms this formulation, stating "absolute immunity does not protect 'the investigative functions normally performed by a detective or police officer.'" *Rieves v. Town of New Smyrna, Tennessee*, 959 F.3d 678 (6th Cir. 2020)(denying immunity for prosecutors amid "very specific factual allegations that [they] acted outside their role as judicial advocates during the investigative phase of Operation Candy Crush").

Similarly, in *Pownall v Krasner*, No. 23-2049, 2024 WL 4164621 (3d. Cir. Sept. 12, 2024), the Third Circuit confirmed the breadth of prosecutorial grand jury advocacy, stating that "[a] prosecutor's grand jury preparations and decisions to prosecute constitute advocacy are covered by absolute immunity" in affirming the district court's dismissal. *Pownall* at *4. In *Kent v. Cardone*, NO. 10-818-cv, 404 F.App'x 540 (2d. Cir. 2011), the Second Circuit reversed the district court's denial of the dismissal of claims against a prosecutor, finding that absolute immunity applied even as the Court vehemently criticized the prosecutor's conduct.

61050986 v1                                          15

In none of these cases did a Court determine that a prosecutor's actions before a very short-term grand jury (30 days or less) could be considered investigatory and thus not subject to absolute immunity. The Supreme Court in *Burns v. Reed*, 500 U.S. 478 (1991) noted the "widespread agreement among the Courts of Appeals that prosecutors are absolutely immune from liability under § 1983 for their conduct before grand juries." *Burns*, *supra,* 500 U.S. at 490 n.6.

## VII.    CONCLUSION

*Burns*, *supra*, reinforced the important public policy considerations in *Imbler*, *supra*, stating that for "special functions" (like prosecutors), it is "better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation." *Burns*, 500 U.S. at 484 (quoting *Imbler v. Pachtman*, 424 U.S. 409, 428 (1976)).

Absolute immunity for prosecutors like Billy is integral to the proper function of the judicial system. Any investigatory exception is inapplicable to Billy's actions alleged in the Amended Complaint. Plaintiffs may pursue their grievances against Defendant Billy in other avenues, but Billy is absolutely immune from their § 1983 claims.

Respectfully submitted,

*s/ Michael D. Strasavich*
H. WILLIAM WASDEN          (WASDH4276)
MICHAEL D. STRASAVICH      (STRASM9557)

*Attorneys for Defendant, Stephen Billy*

OF COUNSEL:

BURR & FORMAN LLP
11 North Water Street, Suite 22200
Mobile, Alabama 36602
(251) 344-5151 Telephone
(251) 344-9696 Facsimile
bwasden@burr.com
mstrasavich@burr.com

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that I have filed a copy of the foregoing document using CM/ECF which will send electronic notification to the following on this the 20th of May, 2025.

Jared McClain, Esquire
Institute for Justice
901 N. Glebe Road, Suite 900
Arlington, Virginia 22203
jmcclain@ij.org
*Attorney for Plaintiff*

Christine Harding Hart, Esquire
Emily B. Van Haneghan, Esquire
Hand Arendall Harrison Sale LLC
Post Office Box 123
Mobile, Alabama 36601
chart@handfirm.com
evanhaneghan@handfirm.com

Christopher S. Williams, Esquire
Hand Arendall Harrison Sale LLC
Post Office Box 1499
Fairhope, Alabama 36533
cwilliams@handfirm.com

*Attorneys for Defendants, Sheriff Heath Jackson, Deputy Arthur Odom, Deputy Kevin Durden, Deputy Matthew Rabren and Deputy Steven Dereck Lowry*

 *s/ Michael D. Strasavich*
OF COUNSEL